# IMBLER *v.* PACHTMAN, DISTRICT ATTORNEY

No. 74-5435. Argued November 3, 1975—Decided March 2, 1976

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Rehnquist, JJ., joined. White, J., filed an opinion concurring in the judgment, in which Brennan and Marshall, JJ., joined, *post*, p. 432. Stevens, J., took no part in the consideration or decision of the case.

*Roger S. Hanson* argued the cause and filed a brief for petitioner.

*John P. Farrell* argued the cause for respondent. With him on the brief was *John H. Larson.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae.* With him on the brief were *Acting Assistant Attorney General Keeney, Deputy Solicitor General Friedman, Harry R. Sachse,* and *Jerome M. Feit.**

Mr. Justice Powell delivered the opinion of the Court.

The question presented in this case is whether a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is amenable to suit under 42 U. S. C. § 1983 for alleged deprivations of the defendant's constitutional rights. The Court of Appeals for the Ninth Circuit held that he is not. 500 F. 2d 1301. We affirm.

I

The events which culminated in this suit span many years and several judicial proceedings. They began in

---

**Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Russell Iungerich* and *Edward T. Fogel, Jr.,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* urging affirmance.

*Joseph P. Busch* and *Patrick F. Healy* filed a brief for the National District Attorneys Association as *amicus curiae.*

January 1961, when two men attempted to rob a Los Angeles market run by Morris Hasson. One shot and fatally wounded Hasson, and the two fled in different directions. Ten days later Leonard Lingo was killed while attempting a robbery in Pomona, Cal., but his two accomplices escaped. Paul Imbler, petitioner in this case, turned himself in the next day as one of those accomplices. Subsequent investigation led the Los Angeles District Attorney to believe that Imbler and Lingo had perpetrated the first crime as well, and that Imbler had killed Hasson. Imbler was charged with first-degree felony murder for Hasson's death.

The State's case consisted of eyewitness testimony from Hasson's wife and identification testimony from three men who had seen Hasson's assailants fleeing after the shooting. Mrs. Hasson was unable to identify the gunman because a hat had obscured his face, but from police photographs she identified the killer's companion as Leonard Lingo. The primary identification witness was Alfred Costello, a passerby on the night of the crime, who testified that he had a clear view both as the gunman emerged from the market and again a few moments later when the fleeing gunman—after losing his hat—turned to fire a shot at Costello [1] and to shed his coat [2] before continuing on. Costello positively identified Imbler as the gunman. The second identification witness, an attendant at a parking lot through which the gunman ultimately escaped, testified that he had a side and front view as the man passed. Finally, a customer who was leaving Hasson's market as the robbers entered

---

[1] This shot formed the basis of a second count against Imbler for assault, which was tried with the murder count.

[2] This coat, identified by Mrs. Hasson as that worn by her husband's assailant, yielded a gun determined by ballistics evidence to be the murder weapon.

testified that he had a good look then and as they exited moments later. All of these witnesses identified Imbler as the gunman, and the customer also identified the second man as Leonard Lingo. Rigorous cross-examination failed to shake any of these witnesses.[3]

Imbler's defense was an alibi. He claimed to have spent the night of the Hasson killing bar-hopping with several persons, and to have met Lingo for the first time the morning before the attempted robbery in Pomona. This testimony was corroborated by Mayes, the other accomplice in the Pomona robbery, who also claimed to have accompanied Imbler on the earlier rounds of the bars. The jury found Imbler guilty and fixed punishment at death.[4] On appeal the Supreme Court of California affirmed unanimously over numerous contentions of error. *People* v. *Imbler,* 57 Cal. 2d 711, 371 P. 2d 304 (1962).

Shortly thereafter Deputy District Attorney Richard Pachtman, who had been the prosecutor at Imbler's trial and who is the respondent before this Court, wrote to the Governor of California describing evidence turned up after trial by himself and an investigator for the state correctional authority. In substance, the evidence consisted of newly discovered corroborating witnesses for Imbler's alibi, as well as new revelations about prime witness Costello's background which indicated that he was less trustworthy than he had represented originally to Pachtman and in his testimony. Pachtman noted that leads to some of this information had been available to Imbler's counsel prior to trial but apparently

---

[3] A fourth man who saw Hasson's killer leaving the scene identified Imbler in a pretrial lineup, but police were unable to find him at the time of trial.

[4] Imbler also received a 10-year prison term on the assault charge. See n. 1, *supra.*

had not been developed, that Costello had testified convincingly and withstood intense cross-examination, and that none of the new evidence was conclusive of Imbler's innocence. He explained that he wrote from a belief that "a prosecuting attorney has a duty to be fair and see that all true facts, whether helpful to the case or not, should be presented." [5]

Imbler filed a state habeas corpus petition shortly after Pachtman's letter. The Supreme Court of California appointed one of its retired justices as referee to hold a hearing, at which Costello was the main attraction. He recanted his trial identification of Imbler, and it also was established that on cross-examination and re-direct he had painted a picture of his own background that was more flattering than true. Imbler's corroborating witnesses, uncovered by prosecutor Pachtman's investigations, also testified.

In his brief to the Supreme Court of California on this habeas petition, Imbler's counsel described Pachtman's post-trial detective work as "[i]n the highest tradition of law enforcement and justice," and as a premier example of "devotion to duty." [6] But he also charged that the prosecution had knowingly used false testimony and suppressed material evidence at Imbler's trial.[7] In a thorough opinion by then Justice Traynor, the Supreme Court of California unanimously rejected these contentions and denied the writ. *In re Imbler,*

---

[5] Brief for Respondent, App. A, p. 6. The record does not indicate what specific action was taken in response to Pachtman's letter. We do note that the letter was dated August 17, 1962, and that Imbler's execution, scheduled for September 12, 1962, subsequently was stayed. The letter became a part of the permanent record in the case available to the courts in all subsequent litigation.

[6] Brief for Respondent 5.

[7] See generally *Napue* v. *Illinois,* 360 U. S. 264 (1959); *Brady* v. *Maryland,* 373 U. S. 83 (1963).

60 Cal. 2d 554, 387 P. 2d 6 (1963). The California court noted that the hearing record fully supported the referee's finding that Costello's recantation of his identification lacked credibility compared to the original identification itself, *id.,* at 562, 387 P. 2d, at 10–11, and that the new corroborating witnesses who appeared on Imbler's behalf were unsure of their stories or were otherwise impeached, *id.,* at 569–570, 387 P. 2d, at 14.

In 1964, the year after denial of his state habeas petition, Imbler succeeded in having his death sentence overturned on grounds unrelated to this case. *In re Imbler,* 61 Cal. 2d 556, 393 P. 2d 687 (1964). Rather than resentence him, the State stipulated to life imprisonment. There the matter lay for several years, until in late 1967 or early 1968 Imbler filed a habeas corpus petition in Federal District Court based on the same contentions previously urged upon and rejected by the Supreme Court of California.

The District Court held no hearing. Instead, it decided the petition upon the record, including Pachtman's letter to the Governor and the transcript of the referee's hearing ordered by the Supreme Court of California. Reading that record quite differently than had the seven justices of the State Supreme Court, the District Court found eight instances of state misconduct at Imbler's trial, the cumulative effect of which required issuance of the writ. *Imbler* v. *Craven,* 298 F. Supp. 795, 812 (CD Cal. 1969). Six occurred during Costello's testimony and amounted in the court's view to the culpable use by the prosecution of misleading or false testimony.[8] The other two instances were suppressions of

---

[8] The District Court found that Costello had given certain ambiguous or misleading testimony, and had lied flatly about his criminal record, his education, and his current income. As to the misleading testimony, the court found that either Pachtman or a

evidence favorable to Imbler by a police fingerprint expert who testified at trial and by the police who investigated Hasson's murder.[9]   The District Court ordered that the writ of habeas corpus issue unless California retried Imbler within 60 days, and denied a petition for rehearing.

The State appealed to the Court of Appeals for the Ninth Circuit, claiming that the District Court had failed to give appropriate deference to the factual determinations of the Supreme Court of California as required by 28 U. S. C. § 2254 (d).   The Court of Appeals affirmed, finding that the District Court had merely "reached different conclusions than the state court in applying federal constitutional standards to [the] facts," *Imbler* v. *California*, 424 F. 2d 631, 632, and certiorari was denied, 400 U. S. 865 (1970).   California chose not to retry Imbler, and he was released.

At this point, after a decade of litigation and with Imbler now free, the stage was set for the present suit. In April 1972, Imbler filed a civil rights action, under 42 U. S. C. § 1983 and related statutes, against respondent Pachtman, the police fingerprint expert, and various other officers of the Los Angeles police force.   He alleged

---

police officer present in the courtroom knew it was misleading.  As to the false testimony, the District Court concluded that Pachtman had "cause to suspect" its falsity although, apparently, no actual knowledge thereof.  See 298 F. Supp., at 799–807.  The Supreme Court of California earlier had addressed and rejected allegations based on many of the same parts of Costello's testimony.  It found either an absence of falsehood or an absence of prosecutorial knowledge in each instance.  See *In re Imbler,* 60 Cal. 2d 554, 562–565, and n. 3, 387 P. 2d 6, 10–12, and n. 3 (1963).

[9] See 298 F. Supp., at 809–811.  The Supreme Court of California earlier had rejected similar allegations.  See *In re Imbler, supra,* at 566–568, 387 P. 2d, at 12–13.

that a conspiracy among them unlawfully to charge and convict him had caused him loss of liberty and other grievous injury. He demanded $2.7 million in actual and exemplary damages from each defendant, plus $15,000 attorney's fees.

Imbler attempted to incorporate into his complaint the District Court's decision granting the writ of habeas corpus, and for the most part tracked that court's opinion in setting out the overt acts in furtherance of the alleged conspiracy. The gravamen of his complaint against Pachtman was that he had "with intent, and on other occasions with negligence" allowed Costello to give false testimony as found by the District Court, and that the fingerprint expert's suppression of evidence was "chargeable under federal law" to Pachtman. In addition Imbler claimed that Pachtman had prosecuted him with knowledge of a lie detector test that had "cleared" Imbler, and that Pachtman had used at trial a police artist's sketch of Hasson's killer made shortly after the crime and allegedly altered to resemble Imbler more closely after the investigation had focused upon him.

Pachtman moved under Fed. Rule Civ. Proc. 12 (b)(6) to have the complaint dismissed as to him. The District Court, noting that public prosecutors repeatedly had been held immune from civil liability for "acts done as part of their traditional official functions," found that Pachtman's alleged acts fell into that category and granted his motion. Following the entry of final judgment as to Pachtman under Fed. Rule Civ. Proc. 54 (b), Imbler appealed to the Court of Appeals for the Ninth Circuit. That court, one judge dissenting, affirmed the District Court in an opinion finding Pachtman's alleged acts to have been committed "during prosecutorial activities which can only be characterized as an 'integral part of the judicial process,'" 500 F. 2d, at 1302, quoting

*Marlowe* v. *Coakley,* 404 F. 2d 70 (CA9 1968). We granted certiorari to consider the important and recurring issue of prosecutorial liability under the Civil Rights Act of 1871. 420 U. S. 945 (1975).

## II

Title 42 U. S. C. § 1983 provides that "[e]very person" who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages.[10] The statute thus creates a species of tort liability that on its face admits of no immunities, and some have argued that it should be applied as stringently as it reads.[11] But that view has not prevailed.

This Court first considered the implications of the statute's literal sweep in *Tenney* v. *Brandhove,* 341 U. S. 367 (1951). There it was claimed that members of a state legislative committee had called the plaintiff to appear before them, not for a proper legislative purpose, but to intimidate him into silence on certain matters of public concern, and thereby had deprived him of his constitutional rights. Because legislators in both England and this country had enjoyed absolute immunity for their official actions, *Tenney* squarely presented the issue of whether the Reconstruction Congress had intended to

---

[10] Title 42 U. S. C. § 1983, originally passed as § 1 of the Civil Rights Act of 1871, 17 Stat. 13, reads in full:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[11] See, *e. g., Pierson* v. *Ray,* 386 U. S. 547, 559 (1967) (Douglas, J., dissenting); *Tenney* v. *Brandhove,* 341 U. S. 367, 382–383 (1951) (Douglas, J., dissenting).

restrict the availability in § 1983 suits of those immunities which historically, and for reasons of public policy, had been accorded to various categories of officials. The Court concluded that immunities "well grounded in history and reason" had not been abrogated "by covert inclusion in the general language" of § 1983. 341 U. S., at 376. Regardless of any unworthy purpose animating their actions, legislators were held to enjoy under this statute their usual immunity when acting "in a field where legislators traditionally have power to act." *Id.*, at 379.

The decision in *Tenney* established that § 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them. Before today the Court has had occasion to consider the liability of several types of government officials in addition to legislators. The common-law absolute immunity of judges for "acts committed within their judicial jurisdiction," see *Bradley* v. *Fisher*, 13 Wall. 335 (1872), was found to be preserved under § 1983 in *Pierson* v. *Ray*, 386 U. S. 547, 554–555 (1967).[12] In the same case, local police officers sued for a deprivation of liberty resulting from unlawful arrest were held to enjoy under § 1983 a "good faith and probable cause" defense coextensive with their defense to false arrest actions at

---

[12] The Court described the immunity of judges as follows:

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley* v. *Fisher*, 13 Wall. 335 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.'" 386 U. S., at 553–554 (citation omitted).

common law. 386 U. S., at 555–557. We found qualified immunities appropriate in two recent cases.[13] In *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), we concluded that the Governor and other executive officials of a State had a qualified immunity that varied with "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action. . . ." *Id.,* at 247.[14] Last Term in *Wood* v. *Strickland,* 420 U. S. 308 (1975), we held that school officials, in the context of imposing disciplinary penalties, were not liable so long as they could not reasonably have known that their action violated students' clearly established constitutional rights, and provided they did not act with malicious intention to cause constitutional or other injury. *Id.,* at 322; cf. *O'Connor* v. *Donaldson,* 422 U. S. 563, 577 (1975). In *Scheuer* and in *Wood,* as in the two earlier cases, the considerations underlying the nature of the immunity of the respective officials in suits at common law led to essentially the same immunity under § 1983.[15] See 420 U. S., at 318–321; 416 U. S., at 239–247, and n. 4.

[13] The procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial. See *Scheuer* v. *Rhodes,* 416 U. S. 232, 238–239 (1974); *Wood* v. *Strickland,* 420 U. S. 308, 320–322 (1975).

[14] The elements of this immunity were described in *Scheuer* as follows:

"It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U. S., at 247–248.

[15] In *Tenney* v. *Brandhove,* of course, the Court looked to the

## III

This case marks our first opportunity to address the § 1983 liability of a state prosecuting officer. The Courts of Appeals, however, have confronted the issue many times and under varying circumstances. Although the precise contours of their holdings have been unclear at times, at bottom they are virtually unanimous that a prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties.[16] These courts sometimes have described the prosecutor's immunity as a form of "quasi-judicial" immunity and referred to it as derivative of the immunity of judges recognized in *Pierson* v. *Ray, supra.*[17] Petitioner focuses upon the "quasi-judicial" characterization, and contends that it illustrates a fundamental illogic in according absolute immunity to a prosecutor. He argues that the prosecutor, as a member of the executive branch, cannot claim the immunity reserved for the judiciary, but only a qualified immunity

---

immunity accorded legislators by the Federal and State Constitutions, as well as that developed by the common law. 341 U. S., at 372–375. See generally *Doe* v. *McMillan,* 412 U. S. 306 (1973).

[16] *Fanale* v. *Sheehy,* 385 F. 2d 866, 868 (CA2 1967); *Bauers* v. *Heisel,* 361 F. 2d 581 (CA3 1966), cert. denied, 386 U. S. 1021 (1967); *Carmack* v. *Gibson,* 363 F. 2d 862, 864 (CA5 1966); *Tyler* v. *Witkowski,* 511 F. 2d 449, 450–451 (CA7 1975); *Barnes* v. *Dorsey,* 480 F. 2d 1057, 1060 (CA8 1973); *Kostal* v. *Stoner,* 292 F. 2d 492, 493 (CA10 1961), cert. denied, 369 U. S. 868 (1962); cf. *Guerro* v. *Mulhearn,* 498 F. 2d 1249, 1255–1256 (CA1 1974); *Weathers* v. *Ebert,* 505 F. 2d 514, 515–516 (CA4 1974). But compare *Hurlburt* v. *Graham,* 323 F. 2d 723 (CA6 1963), with *Hilliard* v. *Williams,* 465 F. 2d 1212 (CA6), cert. denied, 409 U. S. 1029 (1972). See Part IV, *infra.*

[17] *E. g., Tyler* v. *Witkowski, supra,* at 450; *Kostal* v. *Stoner, supra,* at 493; *Hampton* v. *City of Chicago,* 484 F. 2d 602, 608 (CA7 1973), cert. denied, 415 U. S. 917 (1974). See n. 20, *infra.*

akin to that accorded other executive officials in this Court's previous cases.

Petitioner takes an overly simplistic approach to the issue of prosecutorial liability. As noted above, our earlier decisions on § 1983 immunities were not products of judicial fiat that officials in different branches of government are differently amenable to suit under § 1983. Rather, each was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it. The liability of a state prosecutor under § 1983 must be determined in the same manner.

## A

The function of a prosecutor that most often invites a common-law tort action is his decision to initiate a prosecution, as this may lead to a suit for malicious prosecution if the State's case misfires. The first American case to address the question of a prosecutor's amenability to such an action was *Griffith* v. *Slinkard*, 146 Ind. 117, 44 N. E. 1001 (1896).[18] The complaint charged that a local prosecutor without probable cause added the plaintiff's name to a grand jury true bill after the grand jurors had refused to indict him, with the result that the plaintiff was arrested and forced to appear in court repeatedly before the charge finally was *nolle prossed*. Despite allegations of malice, the Supreme Court of Indiana dismissed the action on the ground that the prosecutor was absolutely immune. *Id.*, at 122, 44 N. E., at 1002.

---

[18] The Supreme Court of Indiana in *Griffith* cited an earlier Massachusetts decision, apparently as authority for its own holding. But that case, *Parker* v. *Huntington*, 68 Mass. 124 (1854), involved the elements of a malicious prosecution cause of action rather than the immunity of a prosecutor. See also Note, 73 U. Pa. L. Rev. 300, 304 (1925).

The *Griffith* view on prosecutorial immunity became the clear majority rule on the issue.[19] The question eventually came to this Court on writ of certiorari to the Court of Appeals for the Second Circuit. In *Yaselli* v. *Goff*, 12 F. 2d 396 (1926), the claim was that the defendant, a Special Assistant to the Attorney General of the United States, maliciously and without probable cause procured plaintiff's grand jury indictment by the willful introduction of false and misleading evidence. Plaintiff sought some $300,000 in damages for having been subjected to the rigors of a trial in which the court ultimately directed a verdict against the Government. The District Court dismissed the complaint, and the Court of Appeals affirmed. After reviewing the development of the doctrine of prosecutorial immunity, *id.*, at 399–404, that court stated:

> "In our opinion the law requires us to hold that a special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. The immunity is absolute, and is grounded on principles of public policy." *Id.*, at 406.

After briefing and oral argument, this Court affirmed the Court of Appeals in a *per curiam* opinion. *Yaselli* v. *Goff*, 275 U. S. 503 (1927).

The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-

---

[19] *Smith* v. *Parman*, 101 Kan. 115, 165 P. 663 (1917); *Semmes* v. *Collins*, 120 Miss. 265, 82 So. 145 (1919); *Kittler* v. *Kelsch*, 56 N. D. 227, 216 N. W. 898 (1927); *Watts* v. *Gerking*, 111 Ore. 654, 228 P. 135 (1924) (on rehearing). Contra, *Leong Yau* v. *Carden*, 23 Haw. 362 (1916).

law immunities of judges and grand jurors acting within the scope of their duties.[20]  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.  One court expressed both considerations as follows:

> "The office of public prosecutor is one which must be administered with courage and independence.  Yet how can this be if the prosecutor is made subject to suit by those whom he accuses and fails to convict?  To allow this would open the way for unlimited harassment and embarrassment of the most conscientious officials by those who would profit thereby.  There would be involved in every case the possible consequences of a failure to obtain a con-

[20] The immunity of a judge for acts within his jurisdiction has roots extending to the earliest days of the common law.  See *Floyd* v. *Barker*, 12 Coke 23, 77 Eng. Rep. 1305 (1608).  Chancellor Kent traced some of its history in *Yates* v. *Lansing*, 5 Johns. 282 (N. Y. 1810), and this Court accepted the rule of judicial immunity in *Bradley* v. *Fisher*, 13 Wall. 335 (1872).  See n. 12, *supra*.  The immunity of grand jurors, an almost equally venerable common-law tenet, see *Floyd* v. *Barker*, *supra*, also has been adopted in this country.  See, *e. g.*, *Turpen* v. *Booth*, 56 Cal. 65 (1880); *Hunter* v. *Mathis*, 40 Ind. 356 (1872).  Courts that have extended the same immunity to the prosecutor have sometimes remarked on the fact that all three officials—judge, grand juror, and prosecutor—exercise a discretionary judgment on the basis of evidence presented to them.  *Smith* v. *Parman*, *supra; Watts* v. *Gerking*, *supra*.  It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as "quasi-judicial" officers, and their immunities being termed "quasi-judicial" as well.  See, *e. g.*, *Turpen* v. *Booth*, *supra*, at 69; *Watts* v. *Gerking*, *supra*, at 661, 228 P., at 138.

viction. There would always be a question of possible civil action in case the prosecutor saw fit to move dismissal of the case. . . . The apprehension of such consequences would tend toward great uneasiness and toward weakening the fearless and impartial policy which should characterize the administration of this office. The work of the prosecutor would thus be impeded and we would have moved away from the desired objective of stricter and fairer law enforcement." *Pearson* v. *Reed,* 6 Cal. App. 2d 277, 287, 44 P. 2d 592, 597 (1935).

See also *Yaselli* v. *Goff,* 12 F. 2d, at 404–406.

## B

The common-law rule of immunity is thus well settled.[21] We now must determine whether the same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under § 1983. We think they do.

If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a

---

[21] See, *e. g., Gregoire* v. *Biddle,* 177 F. 2d 579 (CA2 1949), cert. denied, 339 U. S. 949 (1950); *Cooper* v. *O'Connor,* 69 App. D. C. 100, 99 F. 2d 135, 140–141 (1938); *Anderson* v. *Rohrer,* 3 F. Supp. 367 (SD Fla. 1933); *Pearson* v. *Reed,* 6 Cal. App. 2d 277, 44 P. 2d 592 (1935); *Anderson* v. *Manley,* 181 Wash. 327, 43 P. 2d 39 (1935). See generally Restatement of Torts § 656 and comment b (1938); 1 F. Harper & F. James, The Law of Torts § 4.3, pp. 305–306 (1956).

suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. Cf. *Bradley* v. *Fisher*, 13 Wall., at 348; *Pierson* v. *Ray*, 386 U. S., at 554. Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

Moreover, suits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor. The prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument, and—ultimately in every case—the likelihood that prosecutorial misconduct so infected a trial as to deny due process, are typical of issues with which judges struggle in actions for post-trial relief, sometimes to differing conclusions.[22] The presentation of such issues in a § 1983 action often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury. It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials. Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after they were made, could impose unique

---

[22] This is illustrated by the history of the disagreement as to the culpability of the prosecutor's conduct in this case. We express no opinion as to which of the courts was correct. See nn. 8 and 9, *supra*.

and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials. Cf. *Bradley* v. *Fisher, supra,* at 349.

The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system. Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence.[23] The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify, as is illustrated by the history of this case. If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.[24]

---

[23] In the law of defamation, a concern for the airing of all evidence has resulted in an absolute privilege for any courtroom statement relevant to the subject matter of the proceeding. In the case of lawyers the privilege extends to their briefs and pleadings as well. See generally 1 T. Cooley, Law of Torts § 153 (4th ed. 1932); 1 F. Harper & F. James, *supra,* § 5.22. In the leading case of *Hoar* v. *Wood,* 44 Mass. 193 (1841), Chief Justice Shaw expressed the policy decision as follows:

"Subject to this restriction [of relevancy], it is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions." *Id.,* at 197–198.

[24] A prosecutor often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet, a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages. Cf. American Bar Association Project on Stand-

The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability. Various post-trial procedures are available to determine whether an accused has received a fair trial. These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.[25]

We conclude that the considerations outlined above dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law. To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper function-

---

ards for Criminal Justice, Prosecution and Defense Function § 3.9 (c) (Approved Draft 1971).

[25] The possibility of personal liability also could dampen the prosecutor's exercise of his duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction. Cf. ABA Code of Professional Responsibility § EC 7–13 (1969); ABA, Standards, *supra*, § 3.11. Indeed, the record in this case suggests that respondent's recognition of this duty led to the post-conviction hearing which in turn resulted ultimately in the District Court's granting of the writ of habeas corpus.

ing of the criminal justice system.[26] Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice. With the issue thus framed, we find ourselves in agreement with Judge Learned Hand, who wrote of the prosecutor's immunity from actions for malicious prosecution:

> "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire* v. *Biddle,* 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950).

See *Yaselli* v. *Goff,* 12 F. 2d, at 404; cf. *Wood* v. *Strickland,* 420 U. S., at 320.[27]

We emphasize that the immunity of prosecutors from

---

[26] In addressing the consequences of subjecting judges to suits for damages under § 1983, the Court has commented:

"Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." *Pierson* v. *Ray,* 386 U. S., at 554.

[27] Petitioner contends that his suit should be allowed, even if others would not be, because the District Court's issuance of the writ of habeas corpus shows that his suit has substance. We decline to carve out such an exception to prosecutorial immunity. Petitioner's success on habeas, where the question was the alleged misconduct by several state agents, does not necessarily establish the merit of his civil rights action where only the respondent's alleged wrongdoing is at issue. Certainly nothing determined on habeas would bind respondent, who was not a party. Moreover, using the habeas proceeding as a "door-opener" for a subsequent civil rights action would create the risk of injecting extraneous concerns into that proceeding. As we noted in the text, consideration of the habeas petition could well be colored by an awareness of potential prosecutorial liability.

liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U. S. C. § 242,[28] the criminal analog of § 1983. *O'Shea* v. *Littleton,* 414 U. S. 488, 503 (1974); cf. *Gravel* v. *United States,* 408 U. S. 606, 627 (1972). The prosecutor would fare no better for his willful acts.[29] Moreover, a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers.[30] These checks undermine the argument that the imposition of civil liability is the only way to insure that prosecutors are mindful of the constitutional rights of persons accused of crime.

---

[28] "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life."

[29] California also appears to provide for criminal punishment of a prosecutor who commits some of the acts ascribed to respondent by petitioner. Cal. Penal Code § 127 (1970); cf. *In re Branch,* 70 Cal. 2d 200, 210–211, 449 P. 2d 174, 181 (1969).

[30] See ABA Code of Professional Responsibility § EC 7–13. See generally ABA, Standards, *supra,* n. 24, §§ 1.1 (c), (e), and Commentary, pp. 44–45.

## IV

It remains to delineate the boundaries of our holding. As noted, *supra,* at 416, the Court of Appeals emphasized that each of respondent's challenged activities was an "integral part of the judicial process." 500 F. 2d, at 1302. The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys, not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's.[31] See *Pierson* v. *Ray,* 386 U. S., at 557. We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force.[32] We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative

[31] *Guerro* v. *Mulhearn,* 498 F. 2d, at 1256; *Hampton* v. *City of Chicago,* 484 F. 2d, at 608–609; *Robichaud* v. *Ronan,* 351 F. 2d 533, 537 (CA9 1965); cf. *Madison* v. *Purdy,* 410 F. 2d 99 (CA5 1969); *Lewis* v. *Brautigam,* 227 F. 2d 124 (CA5 1955). But cf. *Cambist Films, Inc.* v. *Duggan,* 475 F. 2d 887, 889 (CA3 1973).

[32] Both in his complaint in District Court and in his argument to us, petitioner characterizes some of respondent's actions as "police-related" or investigative. Specifically, he points to a request by respondent of the police during a courtroom recess that they hold off questioning Costello about a pending bad-check charge until after Costello had completed his testimony. Petitioner asserts that this request was an investigative activity because it was a direction to police officers engaged in the investigation of crime. Seen in its proper light, however, respondent's request of the officers was an effort to control the presentation of his witness' testimony, a task fairly within his function as an advocate.

officer rather than that of advocate.[33]   We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.[34]   The judgment of the Court of Appeals for the Ninth Circuit accordingly is

*Affirmed.*

---

[33] We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.   A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues.   These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present.   Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.   At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court.   Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

[34] Mr. Justice White, concurring in the judgment, would distinguish between willful use by a prosecutor of perjured testimony and willful suppression by a prosecutor of exculpatory information.   In the former case, Mr. Justice White agrees that absolute immunity is appropriate.   He thinks, however, that only a qualified immunity is appropriate where information relevant to the defense is "unconstitutionally *withheld* . . . from the court." *Post,* at 443.

We do not accept the distinction urged by Mr. Justice White for several reasons.   As a matter of principle, we perceive no less an infringement of a defendant's rights by the knowing use of perjured testimony than by the deliberate withholding of exculpatory information.   The conduct in either case is reprehensible, warranting criminal prosecution as well as disbarment.   See *supra,* at 429 nn. 29 and 30.   Moreover, the distinction is not susceptible of practical application.   A claim of using perjured· testimony simply may be reframed and asserted as a claim of suppression of the evidence upon which the knowledge of perjury rested.   That the two types of claims can thus be viewed is clear from our cases discussing the constitutional prohibitions against both practices.   *Mooney* v. *Holohan,* 294

Mr. Justice Stevens took no part in the consideration or decision of this case.

Mr. Justice White, with whom Mr. Justice Brennan and Mr. Justice Marshall join, concurring in the judgment.

I concur in the judgment of the Court and in much of its reasoning. I agree with the Court that the gravamen of the complaint in this case is that the prosecutor knowingly used perjured testimony; and that a prosecutor is absolutely immune from suit for money damages under 42 U. S. C. § 1983 for presentation of testimony later determined to have been false, where the presentation of such testimony is alleged to have been unconstitutional solely because the prosecutor did not believe it or should not have believed it to be true. I write, however, because I believe that the Court's opinion may be read as

U. S. 103, 110 (1935); *Alcorta* v. *Texas,* 355 U. S. 28, 31–32 (1957); *Brady* v. *Maryland,* 373 U. S. 83, 86 (1963); *Miller* v. *Pate,* 386 U. S. 1, 4–6 (1967); *Giglio* v. *United States,* 405 U. S. 150, 151–155 (1972). It is also illustrated by the history of this case: at least one of the charges of prosecutorial misconduct discussed by the Federal District Court in terms of suppression of evidence had been discussed by the Supreme Court of California in terms of use of perjured testimony. Compare *Imbler* v. *Craven,* 298 F. Supp., at 809–811, with *In re Imbler,* 60 Cal. 2d, at 566–567, 387 P. 2d, at 12–13. Denying absolute immunity from suppression claims could thus eviscerate, in many situations, the absolute immunity from claims of using perjured testimony.

We further think Mr. Justice White's suggestion, *post,* at 440 n. 5, that absolute immunity should be accorded only when the prosecutor makes a "full disclosure" of all facts casting doubt upon the State's testimony, would place upon the prosecutor a duty exceeding the disclosure requirements of *Brady* and its progeny, see 373 U. S., at 87; *Moore* v. *Illinois,* 408 U. S. 786, 795 (1972); cf. *Donnelly* v. *DeChristoforo,* 416 U. S. 637, 647–648 (1974). It also would weaken the adversary system at the same time it interfered seriously with the legitimate exercise of prosecutorial discretion.

extending to a prosecutor an immunity broader than that
to which he was entitled at common law; broader than is
necessary to decide this case; and broader than is neces-
sary to protect the judicial process. Most seriously, I
disagree with any implication that *absolute* immunity
for prosecutors extends to suits based on claims of uncon-
stitutional suppression of evidence because I believe such
a rule would threaten to *injure* the judicial process and to
interfere with Congress' purpose in enacting 42 U. S. C.
§ 1983, without any support in statutory language or
history.

I

Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute,
ordinance, regulation, custom, or usage, of any State
or Territory, subjects, or causes to be subjected, any
citizen of the United States or other person within
the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Con-
stitution . . . shall be liable to the party injured in
an action at law, suit in equity, or other proper
proceeding for redress."

As the language itself makes clear, the central purpose
of § 1983 is to "give a remedy to parties deprived of
constitutional rights, privileges and immunities by an
*official's* abuse of his position." *Monroe* v. *Pape*, 365
U. S. 167, 172 (1961) (emphasis added). The United
States Constitution among other things, places substan-
tial limitations upon state action, and the cause of action
provided in 42 U. S. C. § 1983 is fundamentally one for
"[m]isuse of power, possessed by virtue of state law and
made possible only because the wrongdoer is clothed with
the authority of state law." *United States* v. *Classic*, 313
U. S. 299, 326 (1941). It is manifest then that all state

officials as a class cannot be immune absolutely from
damage suits under 42 U. S. C. § 1983 and that to extend
absolute immunity to any group of state officials is to
negate *pro tanto* the very remedy which it appears Con-
gress sought to create. *Scheuer* v. *Rhodes,* 416 U. S. 232,
243 (1974). Thus, as there is no language in 42 U. S. C.
§ 1983 extending *any* immunity to any state officials, the
Court has not extended *absolute* immunity to such
officials in the absence of the most convincing showing
that the immunity is necessary. Accordingly, we have
declined to construe § 1983 to extend absolute immunity
from damage suits to a variety of state officials, *Wood*
v. *Strickland,* 420 U. S. 308 (1975) (school board mem-
bers); *Scheuer* v. *Rhodes, supra* (various executive
officers, including the State's chief executive officer);
*Pierson* v. *Ray,* 386 U. S. 547 (1967) (policemen); and
this notwithstanding the fact that, at least with respect
to high executive officers, absolute immunity from suit
for damages would have applied at common law. *Spal-
ding* v. *Vilas,* 161 U. S. 483 (1896); *Alzua* v. *Johnson,* 231
U. S. 106 (1913). Instead, we have construed the statute
to extend only a qualified immunity to these officials, and
they may be held liable for unconstitutional conduct ab-
sent "good faith." *Wood* v. *Strickland, supra,* at 315.
Any other result would "deny much of the promise of
§ 1983." *Id.,* at 322. Nonetheless, there are certain ab-
solute immunities so firmly rooted in the common law and
supported by such strong policy reasons that the Court
has been unwilling to infer that Congress meant to abol-
ish them in enacting 42 U. S. C. § 1983. Thus, we have
held state legislators to be absolutely immune from liabil-
ity for damages under § 1983 for their legislative acts,
*Tenney* v. *Brandhove,* 341 U. S. 367 (1951),[1] and state

---

[1] The Court emphasized that the immunity had a lengthy history
at common law, and was written into the United States Constitution

judges to be absolutely immune from liability for their judicial acts, *Pierson* v. *Ray, supra*.[2]

In justifying absolute immunity for certain officials, both at common law and under 42 U. S. C. § 1983, courts have invariably rested their decisions on the proposition that such immunity is necessary to protect the decision-making process in which the official is engaged. Thus legislative immunity was justified on the ground that such immunity was essential to protect "freedom of speech and action in the legislature" from the dampening effects of threatened lawsuits. *Tenney* v. *Brandhove, supra*, at 372. Similarly, absolute immunity for judges was justified on the ground that no matter how high the standard of proof is set, the burden of defending damage suits brought by disappointed litigants would "contribute not to principled and fearless decision-making but to intimidation." *Pierson* v. *Ray, supra*, at 554. In *Bradley* v. *Fisher*, 13 Wall. 335, 347 (1872), the Court stated:

> "For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that inde-

in the "Speech or Debate Clause" and into many state constitutions as well. 341 U. S., at 372–373.

[2] The Court concluded that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine in *Bradley* v. *Fisher*, 13 Wall. 335 (1872)." 386 U. S., at 553–554.

pendence without which no judiciary can be either respectable or useful. . . ."

See also cases discussed in *Yaselli* v. *Goff*, 12 F. 2d 396, 399–401 (CA2 1926), summarily aff'd, 275 U. S. 503 (1927).

The majority articulates other adverse consequences which may result from permitting suits to be maintained against public officials. Such suits may expose the official to an unjust damage award, *ante*, at 425; such suits will be expensive to defend even if the official prevails and will take the official's time away from his job, *ante*, at 425; and the liability of a prosecutor for unconstitutional behavior might induce a federal court in a habeas corpus proceeding to deny a valid constitutional claim in order to protect the prosecutor, *ante*, at 427. However, these adverse consequences are present with respect to suits against policemen, school teachers, and other executives, and have never before been thought sufficient to immunize an official absolutely no matter how outrageous his conduct. Indeed, these reasons are present with respect to suits against all state officials[3] and must necessarily have been rejected by Congress as a basis for absolute immunity under 42 U. S. C. § 1983, for its en-

---

[3] Even the risk that decisions in habeas corpus proceedings will be skewed is applicable in the case of policemen; and if it supplies a sufficient reason to extend absolute immunity to prosecutors, it should have been a sufficient reason to extend such immunity to policemen. Indeed, it is fair to say that far more habeas corpus petitions turn on the constitutionality of action taken by policemen than turn on the constitutionality of action taken by prosecutors. We simply rely on the ability of federal judges correctly to apply the law to the facts with the knowledge that the overturning of a conviction on constitutional grounds hardly dooms the official in question to payment of a damage award in light of the qualified immunity which he possesses, and the inapplicability of the res judicata doctrine, *ante*, at 428 n. 27.

actment is a clear indication that at least some officials should be accountable in damages for their official acts. Thus, unless the threat of suit is also thought to injure the governmental decisionmaking process, the other unfortunate consequences flowing from damage suits against state officials are sufficient only to extend a qualified immunity to the official in question. Accordingly, the question whether a prosecutor enjoys an absolute immunity from damage suits under § 1983, or only a qualified immunity, depends upon whether the common law and reason support the proposition that extending absolute immunity is necessary to protect the *judicial process.*

## II

The public prosecutor's absolute immunity from suit at common law is not so firmly entrenched as a judge's, but it has considerable support. The general rule was, and is, that a prosecutor is absolutely immune from suit for malicious prosecution. 1 F. Harper & F. James, The Law of Torts § 4.3, p. 305 n. 7 (1956) (hereafter Harper & James), and cases there cited; *Yaselli* v. *Goff, supra; Gregoire* v. *Biddle,* 177 F. 2d 579 (CA2 1949); *Kauffman* v. *Moss,* 420 F. 2d 1270 (CA3 1970); *Bauers* v. *Heisel,* 361 F. 2d 581 (CA3 1965); *Tyler* v. *Witkowski,* 511 F. 2d 449 (CA7 1975); *Hampton* v. *City of Chicago,* 484 F. 2d 602 (CA7 1973); *Barnes* v. *Dorsey,* 480 F. 2d 1057 (CA8 1973); *Duba* v. *McIntyre,* 501 F. 2d 590 (CA8 1974); *Robichaud* v. *Ronan,* 351 F. 2d 533 (CA9 1965). But see *Leong Yau* v. *Carden,* 23 Haw. 362 (1916). The rule, like the rule extending absolute immunity to judges, rests on the proposition that absolute immunity is necessary to protect the judicial process. Absent immunity, " 'it would be but human that they [prosecutors] might refrain from presenting to a grand jury or prosecuting a matter which in their judgment called for action; but

which a jury might possibly determine otherwise.'" 1
Harper & James § 4.3, pp. 305–306, quoting *Yaselli* v.
*Goff*, 8 F. 2d 161, 162 (SDNY 1925). Indeed, in deciding
whether or not to prosecute, the prosecutor performs a
"quasi-judicial" function. 1 Harper & James 305; *Ya-
selli* v. *Goff*, 12 F. 2d, at 404. Judicial immunity had
always been extended to grand jurors with respect to their
actions in returning an indictment, *id.*, at 403, and " 'the
public prosecutor, in deciding whether a particular prose-
cution shall be instituted . . . performs much the same
function as a grand jury.'" *Id.*, at 404, quoting *Smith* v.
*Parman*, 101 Kan. 115, 165 P. 633 (1917). The analogy
to judicial immunity is a strong one. Moreover, the risk
of injury to the judicial process from a rule permitting
malicious prosecution suits against prosecutors is real.
There is no one to sue the prosecutor for an erroneous
decision *not* to prosecute. If suits for malicious prosecu-
tion were permitted,[4] the prosecutor's incentive would al-
ways be not to bring charges. Moreover, the "fear of
being harassed by a vexatious suit, for acting according
to their consciences" would always be the greater "where
powerful" men are involved, 1 W. Hawkins, Pleas of the
Crown 349 (6th ed. 1787). Accordingly, I agree with the
majority that, with respect to suits based on claims that
the prosecutor's decision to prosecute was malicious and
without probable cause—at least where there is no inde-
pendent allegation that the prosecutor withheld exculpa-
tory information from a grand jury or the court, see Part
III, *infra*—the judicial process is better served by abso-
lute immunity than by any other rule.

---

[4] I agree with the majority that it is not sufficient merely to
set the standard of proof in a malicious prosecution case very high.
If this were done, it might be possible to eliminate the danger of
an unjust damage award against a prosecutor. However, the risk
of having to *defend* a suit—even if certain of ultimate vindication—
would remain a substantial deterrent to fearless prosecution.

Public prosecutors were also absolutely immune at common law from suits for defamatory remarks made during and relevant to a judicial proceeding, 1 Harper & James §§ 5.21, 5.22; *Yaselli* v. *Goff*, 12 F. 2d, at 402–403; and this immunity was also based on the policy of protecting the judicial process. Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Col. L. Rev. 463 (1909). The immunity was not special to public prosecutors but extended to lawyers accused of making false and defamatory statements, or of eliciting false and defamatory testimony from witnesses; and it applied to suits against witnesses themselves for delivering false and defamatory testimony. 1 Harper & James § 5.22, pp. 423–424, and cases there cited; *King* v. *Skinner*, Lofft 55, 98 Eng. Rep. 529, 530 (K. B. 1772) (*per* Lord Mansfield); *Yaselli* v. *Goff*, 12 F. 2d, at 403. The reasons for this rule are also substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be "given every encouragement to make a full disclosure of all pertinent information within their knowledge." 1 Harper & James § 5.22, p. 424. For a witness, this means he must be permitted to testify without fear of being sued if his testimony is disbelieved. For a lawyer, it means that he must be permitted to call witnesses without fear of being sued if the witness is disbelieved and it is alleged that the lawyer knew or should have known that the witness' testimony was false. Of course, witnesses should not be encouraged to testify falsely nor lawyers encouraged to call witnesses who testify falsely. However, if the risk of having to defend a civil damage suit is added to the deterrent against such

conduct already provided by criminal laws against per-
jury and subornation of perjury, the risk of self-censor-
ship becomes too great.  This is particularly so because
it is very difficult if not impossible for attorneys to be
absolutely certain of the objective truth or falsity of the
testimony which they present.  A prosecutor faced with
a decision whether or not to call a witness whom he
believes, but whose credibility he knows will be in doubt
and whose testimony may be disbelieved by the jury,
should be given every incentive to submit that witness'
testimony to the crucible of the judicial process so that
the factfinder may consider it, after cross-examination,
together with the other evidence in the case to determine
where the truth lies.

> "Absolute privilege has been conceded on obvious
> grounds of public policy to insure freedom of speech
> where it is essential that freedom of speech should
> exist.  It is essential to the ends of justice that all
> persons participating in judicial proceedings (to take
> a typical class for illustration) should enjoy freedom
> of speech in the discharge of their public duties or
> in pursuing their rights, without fear of conse-
> quences."  Veeder, *supra,* 9 Col. L. Rev., at 469.

For the above-stated reasons, I agree with the majority
that history and policy support an absolute immunity
for prosecutors from suits based solely on claims [5] that
they knew or should have known that the testimony of
a witness called by the prosecution was false; and I would
not attribute to Congress an intention to remove such
immunity in enacting 42 U. S. C. § 1983.

---

[5] For the reasons set forth in Part III, *infra,* absolute immunity
would not apply to independent claims that the prosecutor has
withheld facts tending to demonstrate the falsity of his witness' testi-
mony where the alleged facts are sufficiently important to justify a
finding of unconstitutional conduct on the part of the prosecutor.

Since the gravamen of the complaint in this case is that the prosecutor knew or should have known that certain testimony of a witness called by him was untrue and since—for reasons set forth below—the other allegations in the complaint fail to state a cause of action on any other theory, I concur in the judgment in this case. However, insofar as the majority's opinion implies an absolute immunity from suits for constitutional violations other than those based on the prosecutor's decision to initiate proceedings or his actions in bringing information or argument to the court, I disagree. Most particularly I disagree with any implication that the absolute immunity extends to suits charging unconstitutional suppression of evidence. *Brady* v. *Maryland*, 373 U. S. 83 (1963).

### III

There was no absolute immunity at common law for prosecutors other than absolute immunity from suits for malicious prosecution and defamation. There were simply no other causes of action at common law brought against prosecutors for conduct committed in their official capacity.[6] There is, for example, no reported case of a suit at common law against a prosecutor for suppression or nondisclosure of exculpatory evidence. Thus, even if this Court had accepted the proposition, which

---

[6] Immunity of public officials for false arrest was, unlike immunity of public officials for malicious prosecution, not absolute, 1 Harper & James §§ 3.17 and 3.18; and when prosecutors were sued for that tort, they were not held absolutely immune. *Schneider* v. *Shepherd*, 192 Mich. 82, 158 N. W. 182 (1916). A similar result has obtained in the lower courts in suits under 42 U. S. C. § 1983 against prosecutors for initiating unconstitutional arrests. *Robichaud* v. *Ronan*, 351 F. 2d 533 (CA9 1965); *Hampton* v. *Chicago*, 484 F. 2d 602 (CA7 1973); *Wilhelm* v. *Turner*, 431 F. 2d 177, 180–183 (CA8 1970) (dictum); *Balistrieri* v. *Warren*, 314 F. Supp. 824 (WD Wis. 1970). See also *Ames* v. *Vavreck*, 356 F. Supp. 931 (Minn. 1973).

it has not, *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), that Congress incorporated in 42 U. S. C. § 1983 all immunities existing at common law, it would not follow that prosecutors are absolutely immune from suit for all unconstitutional acts committed in the course of doing their jobs. Secondly, it is by no means true that such blanket absolute immunity is necessary or even helpful in protecting the judicial process. It should hardly need stating that, ordinarily, liability in damages for unconstitutional or otherwise illegal conduct has the very desirable effect of deterring such conduct. Indeed, this was precisely the proposition upon which § 1983 was enacted. Absent special circumstances, such as those discussed in Part II, *supra,* with respect to actions attacking the decision to prosecute or the bringing of evidence or argument to the court, one would expect that the judicial process would be protected—and indeed its integrity enhanced—by denial of immunity to prosecutors who engage in unconstitutional conduct.

The absolute immunity extended to prosecutors in defamation cases is designed to encourage them to bring information to the court which will resolve the criminal case. That is its single justification. Lest they withhold valuable but questionable evidence or refrain from making valuable but questionable arguments, prosecutors are protected from liability for submitting before the court information later determined to have been false to their knowledge.[7] It would stand this immunity rule on its head, however, to apply it to a suit based on a claim that

---

[7] The reasons for making a prosecutor absolutely immune from suits for defamation would apply with equal force to other suits based solely upon the prosecutor's conduct in the courtroom designed either to bring facts or arguments to the attention of the court. Thus, a prosecutor would be immune from a suit based on a claim that his summation was unconstitutional or that he deliberately elicited hearsay evidence in violation of the Confrontation Clause.

the prosecutor unconstitutionally *withheld* information from the court. Immunity from a suit based upon a claim that the prosecutor suppressed or withheld evidence would *discourage* precisely the disclosure of evidence sought to be encouraged by the rule granting prosecutors immunity from defamation suits. *Denial* of immunity for unconstitutional withholding of evidence would encourage such disclosure. A prosecutor seeking to protect himself from liability for failure to disclose evidence may be induced to disclose more than is required. But, this will hardly injure the judicial process.[8] Indeed, it will help it. Accordingly, lower courts have held that unconstitutional suppression of exculpatory evidence is beyond the scope of "duties constituting an integral part of the judicial process" and have refused to extend absolute immunity to suits based on such claims. *Hilliard* v. *Williams*, 465 F. 2d 1212, 1218 (CA6), cert. denied, 409 U. S. 1029 (1972); *Haaf* v. *Grams*, 355 F. Supp. 542, 545 (Minn. 1973); *Peterson* v. *Stanczak*, 48 F. R. D. 426 (ND Ill. 1969). Contra, *Barnes* v. *Dorsey*, 480 F. 2d 1057 (CA8 1973).

Equally important, unlike constitutional violations committed in the courtroom—improper summations, introduction of hearsay evidence in violation of the Confrontation Clause, knowing presentation of false testimony—which truly are an "integral part of the judicial process," *ante*, at 416, the judicial process has no way to prevent or correct the constitutional violation of suppressing evidence. The judicial process will by definition be ignorant of the violation when it occurs; and it is

---

[8] There may be circumstances in which ongoing investigations or even the life of an informant might be jeopardized by public disclosure of information thought possibly to be exculpatory. However, these situations may adequately be dealt with by *in camera* disclosure to the trial judge. These considerations do not militate against disclosure, but merely affect the manner of disclosure.

reasonable to suspect that most such violations never surface. It is all the more important, then, to deter such violations by permitting damage actions under 42 U. S. C. § 1983 to be maintained in instances where violations do surface.

The stakes are high. In *Hilliard* v. *Williams, supra,* a woman was convicted of second-degree murder upon entirely circumstantial evidence. The most incriminating item of evidence was the fact that the jacket worn by the defendant at the time of arrest—and some curtains—appeared to have bloodstains on them. The defendant denied that the stains were bloodstains but was convicted and subsequently spent a year in jail. Fortunately, in that case, the defendant later found out that an FBI report—of which the prosecutor had knowledge at the time of the trial and the existence of which he instructed a state investigator not to mention during his testimony—concluded, after testing, that the stains were *not* bloodstains. On retrial, the defendant was acquitted. She sued the prosecutor and the state investigator under 42 U. S. C. § 1983 claiming that the FBI report was unconstitutionally withheld under *Brady* v. *Maryland,* 373 U. S. 83 (1963), and obtained a damage award against both after trial. The prosecutor's petition for certiorari is now pending before this Court. *Hilliard* v. *Williams,* 516 F. 2d 1344 (CA6 1975), cert. pending, No. 75–272. The state investigator's petition, in which he claimed that he had only followed the prosecutor's orders, has been denied. *Clark* v. *Hilliard,* 423 U. S. 1066 (1976). It is apparent that the injury to a defendant which can be caused by an unconstitutional suppression of exculpatory evidence is substantial, particularly if the evidence is never uncovered. It is virtually impossible to identify *any* injury to the judicial process resulting from a rule permitting suits for such unconstitutional

conduct, and it is very easy to identify an injury to the process resulting from a rule which does not permit such suits. Where the reason for the rule extending absolute immunity to prosecutors disappears, it would truly be "monstrous to deny recovery." *Gregoire* v. *Biddle,* 177 F. 2d, at 581.

## IV

The complaint in this case, while fundamentally based on the claim that the prosecutor knew or should have known that his witness had testified falsely in certain respects, does contain some allegations that exculpatory evidence and evidence relating to the witness' credibility had been suppressed. Insofar as the complaint is based on allegations of suppression or failure to disclose, the prosecutor should not, for the reasons set forth above, be absolutely immune. However, as the majority notes, the suppression of fingerprint evidence and the alleged suppression of information relating to certain pretrial lineups is not alleged to have been known in fact to the prosecutor—it is simply claimed that the suppression is legally chargeable to him. While this may be so as a matter of federal habeas corpus law, it is untrue in a civil damage action. The result of a lie-detector test claimed to have been suppressed was allegedly known to respondent, but it would have been inadmissible at Imbler's trial and is thus not constitutionally required to be disclosed. The alteration of the police artist's composite sketch after Imbler was designated as the defendant is not alleged to have been suppressed— and in fact appears not to have been suppressed. The opinion of the California Supreme Court on direct review of Imbler's conviction states that "the picture was modified later, following suggestions of Costello and other witnesses," and that court presumably had before it only the trial record. The other items allegedly sup-

pressed all relate to background information about only one of the three eyewitnesses to testify for the State, and were in large part concededly known to the defense and thus may not be accurately described as suppressed. The single alleged fact not concededly known to the defense which might have been helpful to the defense was that the State's witness had written some bad checks for small amounts and that a criminal charge based on one check was outstanding against him. However, the witness had an extensive criminal record which was known to but not fully used by the defense. Thus, even taken as true, the failure to disclose the check charges is patently insufficient to support a claim of unconstitutional suppression of evidence.[9] The Court

---

[9] The majority points out that the knowing use of perjured testimony is as reprehensible as the deliberate suppression of exculpatory evidence. This is beside the point. The reason for permitting suits against prosecutors for suppressing evidence is not that suppression is especially reprehensible but that the only effect on the process of permitting such suits will be a beneficial one—more information will be disclosed to the court; whereas one of the effects of permitting suits for knowing use of perjured testimony will be detrimental to the process—prosecutors may withhold questionable but valuable testimony from the court.

The majority argues that any "claim of using perjured testimony simply may be reframed and asserted as a claim of suppression." Our treatment of the allegations in this case conclusively refutes the argument. It is relatively easy to allege that a government witness testified falsely and that the prosecutor did not believe the witness; and, if the prosecutor's subjective belief is a sufficient basis for liability, the case would almost certainly have to go to trial. If such suits were permitted, this case would have to go to trial. It is another matter entirely to allege specific objective facts known to the prosecutor of sufficient importance to justify a conclusion that he violated a constitutional duty to disclose. It is no coincidence that petitioner failed to make any such allegations in this case. More to the point—and quite apart from the relative difficulty of pleading a violation of Brady v. Maryland, 373 U. S. 83

has in the past, having due regard for the fact that the obligation of the government to disclose exculpatory evidence is an exception to the normal operation of an adversary system of justice, imposed on state prosecutors a constitutional obligation to turn over such evidence only when the evidence is of far greater significance than that involved here. See *Moore* v. *Illinois,* 408 U. S. 786 (1972). Thus, the only constitutional violation adequately alleged against the prosecutor is that he knew in his mind that testimony presented by him was false; and from a suit based on such a violation, without more, the prosecutor is absolutely immune. For this reason, I concur in the judgment reached by the majority in this case.

---

(1963)—a rule permitting suits based on withholding of specific facts unlike suits based on the prosecutor's disbelief of a witness' testimony will have no detrimental effect on the process. Risk of being sued for suppression will impel the prosecutor to err if at all on the side of overdisclosure. Risk of being sued for disbelieving a witness will impel the prosecutor to err on the side of withholding questionable evidence. The majority does not appear to respond to this point. Any suggestion that the distinction between suits based on suppression of facts helpful to the defense and suits based on other kinds of constitutional violations cannot be understood by district judges who would have to apply the rule is mystifying. The distinction is a simple one.

Finally, the majority states that the rule suggested in this concurring opinion "would place upon the prosecutor a duty exceeding the disclosure requirements of *Brady* and its progeny." The rule suggested in this opinion does no such thing. The constitutional obligation of the prosecutor remains utterly unchanged. We would simply not grant him *absolute immunity* from suits for committing violations of pre-existing constitutional disclosure requirements, if he committed those violations in bad faith.