**Jacqueline BARBERA, as Administratrix of the Goods, Chattels, and Credits of Lena Margaret Barbera, Plaintiff,**

**v.**

**William French SMITH, individually and as Attorney General for the United States; John S. Martin, Jr., individually and as the former United States Attorney for the Southern District of New York; and Stephen Schlessinger, individually and as a former Assistant United States Attorney for the Southern District of New York, Defendants.**

No. 84 Civ. 8624 (SWK).

United States District Court,
S.D. New York.

Feb. 9, 1987.

William M. Kunstler, Ronald L. Kuby, New York City, for plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., by Peter C. Salerno, Asst. U.S. Atty., New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This is an action brought under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, and as a *Bivens* claim under the Fifth Amendment to the United States Constitution pursuant to general federal question jurisdiction, 28 U.S.C. § 1331. This case is presently before the Court on defendants' motion to dismiss for lack of personal jurisdiction over one of the defendants, for failure to state a claim upon which relief can be granted, for lack of subject matter jurisdiction, and on the grounds of absolute and qualified immunity pursuant to Rules 12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56. For the reasons set forth below, defendants' motion is granted in part and denied in part.

### FACTS

This action arises out of the April 1982 murders of Lena Margaret Barbera ("Barbera") and three CBS employees who had come to her aid in a rooftop parking area at Pier 92 in Manhattan.

Barbera was employed as an accountant by the Candor Diamond Corporation ("Candor"). Candor, its employees and former President, Irwin E. Margolies ("Margolies"), were the targets of a fraud investigation conducted by the United States Attorney for the Southern District of New York, defendant John R. Martin ("Martin"), in 1981 and 1982. The Assistant United States Attorney ("AUSA") assigned to the investigation was defendant Stephen Schlessinger ("Schlessinger").

Barbera agreed to cooperate in the government's investigation of Candor sometime in 1981. As part of her cooperation agreement, Barbera pleaded guilty to a single count mail fraud information under 18 U.S.C. § 1341. Barbera's arrest and sentencing were deferred by the court at Schlessinger's request because of Barb-

era's cooperation with the government. Schlessinger promised to recommend a non-custodial sentence as part of the agreement.

Plaintiff, Barbera's administratrix and mother, alleges that, after Barbera began cooperating with the government, her attorney asked Schlessinger to provide Barbera with police protection and Schlessinger refused; that Schlessinger informed Margolies' attorney who, in turn, informed Margolies in December 1981 that two Candor employees, one of whom was Barbera, were cooperating with the government; and that immediately thereafter Margolies hired Donald P. Nash ("Nash") to kill Barbera and Jenny Soo Chin ("Chin"), a coworker and close friend of Barbera, who Margolies wrongly assumed to be the other Candor informant.[1]

In January 1982, Chin disappeared. Plaintiff alleges that, following Chin's disappearance, Barbera again asked Schlessinger for police protection and was again refused.

Barbera was murdered on April 12, 1982. Nash and Margolies subsequently were convicted of the murders of both Chin and Barbera in New York State Supreme Court in April 1983 and May 1984 respectively.

This action was filed in the United States District Court for the Eastern District of New York on July 30, 1984, against William French Smith ("Smith"), the former United States Attorney General, Martin, and Schlessinger, in both their individual and their official capacities. That court transferred this action to the Southern District of New York as the proper place of venue by consent of all parties on November 16, 1984.

Plaintiff alleges that defendant Schlessinger's negligence in informing Margolies' attorney of Barbera's cooperation and in refusing Barbera's requests for police protection and that defendants Martin's and Smith's negligent control and supervision of Schlessinger were the proximate cause

of Barbera's death. Plaintiff alleges that, as a result of defendants' negligence, defendants and the government are subject to tort liability under both the FTCA and *Bivens* because defendants deprived Barbera of her Fifth Amendment right to life without due process of the law.

## DISCUSSION

*The Claims*

### A. *The FTCA Claim*

The FTCA waives the sovereign immunity of the United States under certain specified conditions and must be complied with strictly. *See United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979). The FTCA provides in pertinent part that

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government acting within the scope of his office or employment unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).

■ Suit under the FTCA lies only against the United States, and the district courts lack subject matter jurisdiction over claims asserted against either federal agencies or individual federal employees. *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252, 1256 (2d Cir. 1975). An additional jurisdictional prerequisite to suit under the FTCA is that an administrative claim be filed with the appropriate federal agency before commencement of the district court action. *O'Rourke v. Eastern Airlines, Inc.,* 730 F.2d 842, 855 (2d Cir.1984).

---

1. Plaintiff contends that Schlessinger was, in fact, also working with Gaye Broffman, a for- mer Candor employee, as an informant.

Plaintiff has neither sued the United States nor filed an administrative claim prior to commencement of her action. As a result, plaintiff's FTCA claim must be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

## B. *The Bivens Claim*

Plaintiff brings this action on behalf of Barbera, her deceased daughter, alleging that the negligent and reckless acts of the defendants deprived Barbera of her constitutional right to life without due process of the law in violation of the Fifth Amendment to the United States Constitution. Asserting federal question jurisdiction under 28 U.S.C. § 1331(a), plaintiff seeks compensatory and punitive damages against the defendants for their alleged constitutional violations under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* established that victims of a constitutional violation by a federal agent acting under color of federal law have a right to recover damages against that official in federal court. *See Carlson v. Green*, 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980).[2]

It is not disputed that defendants were federal agents who were acting under color of federal law during the conduct complained of. The issue which this Court is called on to decide is whether this conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution.[3]

■ Fifth Amendment guarantees include, among others, that a person will not be deprived of life without due process of law. However, plaintiff can prove no deprivation of her constitutional rights in this case unless the government had a constitutional duty to protect Barbera. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1983).

■ It is settled that there is no general constitutional right to government protection from criminals or madmen and, as a result, no constitutional duty on the part of the government to provide such protection. *E.g., Estate of Gilmore v. Buckley*, 787 F.2d 714, 720 (1st Cir.1986); *Ellsworth v. City of Racine*, 774 F.2d 182, 185 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986); *Fox v. Custis*, 712 F.2d 84, 89 (4th Cir.1983). However, a right and corollary duty to basic protective services may arise out of a special relationship assumed or created by a government entity in regard to a particular person, *Ellsworth v. City of Racine*, 774 F.2d at 185, such as when the government itself has put an individual in danger, *Escamilla v. City of Santa Ana*, 796 F.2d 266, 269 (9th Cir.1986). The contours of what constitutes a "special relationship" between citizens and the government, acting through its officers, are hazy and indistinct. *Ellsworth v. City of Racine*, 774 F.2d at 185.

In general, it is established that, when the government takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created with respect to that person, and the Constitution imposes a concomitant duty on the government to assume some measure of responsibility for that person's safety and wellbeing. *Estate of Gilmore v. Buckley*, 787 F.2d at 721. Thus, it has been held that the Constitution imposes a duty on the government with

---

**2.** A *Bivens* claim is analogous to a claim under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides a remedy to victims of constitutional violations by any person acting under color of *state* law. To the extent that relevant *Bivens* decisions were not available, this Court relied on relevant section 1983 decisions in its analysis because there is "no reason why the pleading requirements should be any different in actions against federal officials." *Black v. United States*, 534 F.2d 524, 528 (2d Cir.1976).

**3.** If defendants actions rise only to the level of common law, rather than constitutional, torts, the only basis for this Court's subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332. Because both plaintiff and defendant Martin are residents of New York, this Court lacks subject matter jurisdiction over the complaint if the complaint sounds only in common law tort.

respect to the safety or welfare of prison inmates, *see, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); children in the custody and care of state social service agencies, *see, e.g., Doe v. New York City Department of Social Services,* 709 F.2d 782 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); and persons in the care of government hospitals, *see, e.g., Morrison v. Washington County,* 700 F.2d 678 (11th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). *Estate of Gilmore v. Buckley,* 787 F.2d at 721. *See also Jensen v. Conrad,* 747 F.2d 185, 190–94 (4th Cir. 1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985).

In *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (unanimous opinion), the Supreme Court found no constitutional violation by parole officials where the victim was tortured and murdered by a parolee, who had previously been convicted of attempted rape, five months after the parolee had been released from prison. The Court concluded that "under the particular circumstances of [that] parole decision, [the victim's] death [was] too remote a consequence of the parole officers' action" to hold them liable. Two factors appear critical to this conclusion: (1) that five months had elapsed between the state action and the loss of life, and (2) that there was no indication, nor were defendants aware, that the *Martinez* victim, "as distinguished from the public at large, faced any special danger." *Id.* at 285, 100 S.Ct. at 559. However, the Court "need not and does not decide that a parole officer could *never* be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole." *Id.* (emphasis added).

In *Estate of Gilmore v. Buckley,* 787 F.2d 714 (1st Cir.1986), the First Circuit concluded that the plaintiff's estate had not stated a cause of action against a state psychiatrist and county prison officials where the plaintiff, whose life previously had been threatened by a prison inmate, was killed by the inmate while he was on a two day furlough from prison. The Court reasoned that

> The state played no part in creating the threat that Prendergast posed to Gilmore, Prendergast's murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior. For there to be a special relationship implicating the fourteenth amendment, we believe the state must be more directly implicated than it was here in the events causing the victim's death—as, perhaps (although we need not decide), when the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself or affirmatively places her in a position of danger that she would not otherwise have been in. Here, the state and county defendants did not have custody or control over Gilmore, nor did they condone, ratify or in any way instigate Gilmore's homicidal encounter.

*Id.* at 722 (citations omitted).

In *Ellsworth v. City of Racine,* 774 F.2d 182 (7th Cir.1986), the Seventh Circuit suggested that a municipality may have a constitutional duty to provide elementary protective services to an employee where the municipality and its employee had a "special relationship" by virtue of the nature of the employment relationship, but held that such a special relationship did not exist in that case. There, an undercover narcotics officer and his family became the targets of threats as the result of incriminating testimony which he was about to give. The City voluntarily provided police protection to his wife for the eight hours each day that her husband was working. His wife released her bodyguard one day after both had seen a suspicious car in front of her house, and she was severely beaten and threatened shortly after her bodyguard left. She sued, claiming the City negligently failed to provide her round-the-clock protection. One of the members of that Court, concurring in the result, but not basing his conclusions on a determination that no special relationship existed, stated:

A review of the cases suggests at least two factors to consider in deciding whether a special relationship exists. One factor that has been stressed is whether the danger which the defendant allegedly had a duty to prevent was directed at the public at large or only at a specific individual. Another factor to consider is how closely the danger to the plaintiff is linked to actions of the defendant.

*Id.* at 198 (Coffey, C.J. concurring).

■ The plaintiff alleges facts in this case which indicate that Barbera had a "special relationship" with the Offices of the United States Attorney for the Southern District of New York through her cooperation with Schlessinger such that the federal government owed her a duty to assume some measure of responsibility for her safety and well-being. It is beyond question that Barbera faced a special danger that made her distinguishable from the public at large and that defendants knew or should have known of her special status.

Barbera was cooperating in a federal investigation into the criminal activities of the man who ultimately was responsible for her murder. Although she was not directly threatened by Margolies, her co-worker disappeared shortly after Schlessinger told Margolies' attorney that Barbera and an unnamed co-worker were cooperating with the authorities in the investigation. As a result of the disappearance of her co-worker, Barbera asked Schlessinger for and was refused police protection.

Although Schlessinger must have been aware of the special danger which Barbera faced, Barbera herself put Schlessinger on notice of her special danger by requesting protection in light of Chin's disappearance. In effect, Schlessinger placed Barbera in danger by informing Margolies' attorney that Barbera was cooperating with the authorities and then denied her the ability to defend herself by refusing her request for police protection despite the unexplained disappearance of her co-worker.

Barbera satisfies the two criteria on which the Supreme Court relied in *Mar-* *tinez*. First, Barbera was distinguished from the public at large and defendants were or should have been aware of her special situation because Barbera was cooperating in the Candor investigation and Schlessinger had informed Margolies' attorney of her cooperation. Second, Barbera's request for protection came shortly after Chin's disappearance and her murder occurred less than three months later while she was still cooperating in the investigation. As a result, her murder was not the remote occurrence found in the *Martinez* facts. Barbera also satisfies the concerns enunciated in *Buckley* and the *Ellsworth* concurrence because Schlessinger affirmatively placed Barbera in danger by informing Margolies' attorney of her cooperation in the ongoing investigation.

Barbera fits squarely within the established "special relationship" criteria. As a result, plaintiff states a cause of action pursuant to *Bivens* as to defendant Schlessinger, and Schlessinger's motion to dismiss as to this claim is denied. The Court next considers whether defendants Smith and Martin are proper parties to this action.

### Jurisdiction over William French Smith

■ Plaintiff seeks damages from defendant William French Smith, a former United States Attorney General, based in Washington, D.C. during his tenure, in both his individual and official capacities. However, a *Bivens* claim can be maintained against a federal official only in his individual capacity. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. at 397, 91 S.Ct. at 2005. As a result, there is no basis for any claim against Smith in his official capacity.

It is well settled that, in both diversity and federal question cases, a district court looks to state law to determine in what manner and under what circumstances a party not present in the forum state can be subjected to the jurisdiction of a federal district court. *Marsh v. Kitchen*, 480 F.2d 1270, 1272 n. 6 (2d Cir.1973). Here, personal jurisdiction is assessed under New York's long arm statute which provides

*Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y.Civ.Prac.Law § 302(a) (McKinney 1972 & Supp.1987).

Plaintiff bears the burden of proving that the person over whom jurisdiction is asserted falls within the statute's embrace. *E.g., McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936); *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir.1975); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 389 (S.D.N.Y.1978).

Plaintiff alleges that Smith, as Attorney General of the United States, recklessly and negligently failed to adequately train and supervise his subordinates, defendants Martin and Schlessinger, and that Smith's failure caused Barbera's death. Plaintiff's assertion of jurisdiction over Smith pursuant to Sections 302(a)(1), 302(a)(2) and 302(a)(3)(i) of New York's long arm statute is premised on the theory of agency. Plaintiff claims that Martin and Schlessinger were acting within New York State as Smith's agents for the purposes of transacting business under Section 302(a)(1), committing a tortious act under Section 302(a)(2), and engaging in a persistent course of conduct under Section 302(a)(3)(i).

In *Grove Press, Inc. v. Angleton,* 649 F.2d 121 (2d Cir.1981), the Second Circuit rejected the district court's assertion of jurisdiction over three non-resident employees of the Central Intelligence Agency (the "CIA"), including its then Director. Jurisdiction had been asserted in that case based on a similar theory of agency, i.e., that unnamed CIA agents had committed tortious acts in New York pursuant to Section 302(a)(2) as agents for the non-resident CIA employees. *Accord Marsh v. Kitchen,* 480 F.2d at 1270 (where the Second Circuit held that the district court had no personal jurisdiction under Sections 302(a)(1) and (2) over a non-resident AUSA based on a similar theory of agency).

In *Grove Press,* the Second Circuit held that, before an agency relationship can be held to exist under New York's long arm statute, a showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control of, the non-resident principal. *Grove Press, Inc. v. Angleton,* 649 F.2d at 122. Furthermore, under New York law, it is established that New York's long arm statute does not provide jurisdiction over a defendant in his individual capacity based on an agent's tortious act within the state unless the agent was representing the defendant in his individual capacity. *Green v. McCall,* 710 F.2d 29, 33 (2d Cir.1983).

Here, as in *Grove Press* and *Marsh,* defendants Martin and Schlessinger "were simply United States employees acting as agents for the United States government." *Grove Press, Inc. v. Angleton,* 649 F.2d at 123. More than this is required to make a prima facie showing that Martin and

Schlessinger were Smith's personal agents. *Id.* Plaintiff here does not allege more.

Furthermore, the two cases relied on by plaintiff to assert jurisdiction over Smith are inapposite. *Clark v. United States,* 481 F.Supp. 1086 (S.D.N.Y.1979), clearly is no longer good law in light of the Second Circuit's *Grove Press* decision. *Trafalgar Capital Corp. v. Oil Producers Equipment Corp.,* 555 F.Supp. 305 (S.D.N.Y. 1983), is not on point because the district court there *presumed* the agency of two corporate officers acting in New York on behalf of their corporation.

Accordingly, defendant Smith's motion to dismiss as to him for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure is granted.

*Stating a Claim as to Defendant John R. Martin*

Plaintiff's complaint alleges that

Among other things, defendant MARTIN negligently and recklessly failed properly to provide the requisite training and supervision of defendant SCHLESSINGER, which said failure resulted in the death of plaintiff's intestate and the loss to plaintiff of her daughter's services, comfort, and companionship.

■ Defendants argue (1) that these allegations are impermissibly vague and insufficient to state a claim against Martin upon which relief may be granted, (2) that Martin may not be held personally liable under the doctrine of *respondeat superior* for the action or inaction of his subordinates, and (3) that negligent supervision does not rise to the level of a constitutional tort. Plaintiff, on the other hand, contends (1) that her averments plainly state the conduct of Martin which gave rise to the alleged constitutional violation and that nothing more is required to state a claim, (2) that plaintiff's claim is not brought under the doctrine of *respondeat superior;* rather, plaintiff properly seeks to hold Martin liable for his own negligent and reckless acts; and (3) that failure to supervise does create a cause of action here.

Plaintiff is obligated to make a short and plain statement of the essential elements of her claim in her complaint. Fed.R.Civ.P. 8(a). This she has done. Plaintiff is not required to set out the facts in detail, and the complaint will survive a motion to dismiss unless it appears beyond a doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983).

Furthermore, the cases cited by defendants for the proposition that more than general allegations are required to state a claim are inapposite as they pertain to the specificity required to plead *conspiracy* to deprive a person of constitutional rights, which is not alleged here. Nor is plaintiff's claim based on a theory of *respondeat superior,* and defendants' arguments to the contrary are unavailing. Plaintiff's complaint alleges only that Martin's *own* negligent and reckless conduct in training and supervising Schlessinger resulted in Barbera's death.

A claim for relief under Section 1983 only need allege that some person acting under color of state law deprived the claimant of a federal right. *Green v. Maraio,* 722 F.2d 1013, 1016 (2d Cir.1983). By analogy, then, a *Bivens* claim must allege that a federal official acting under color of federal law deprived plaintiff of a constitutional right. In addition, the claim should set forth the illegal misconduct and resultant harm in such a way as will permit an informed ruling as to whether the wrong complained of is of federal cognizance. *Durso v. Rowe,* 579 F.2d 1365, 1371 (7th Cir.) (quoting *Duncan v. Nelson,* 466 F.2d 939, 943 (7th Cir.), *cert. denied,* 409 U.S. 894, 93 S.Ct. 116, 175, 34 L.Ed.2d 152 (1972)), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1978). Plaintiff's complaint alleges the proper elements for a *Bivens* claim and sets them forth sufficiently for this Court to determine whether the wrong complained of as to Martin rises to the level of a constitutional claim.

The law clearly allows actions against supervisors as long as sufficient causal

connection is present and the plaintiff was deprived under color of law of a constitutional right. The Second Circuit recently outlined the limits of liability of a supervisory official:

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction, *see, e.g., Johnson v. Glick,* 481 F.2d 1028, 1033–34 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (prison guard liable for beating inmate); *Sostre v. McGinnis,* 442 F.2d 178, 205 (2d Cir. 1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) (prison warden liable for ordering that inmate be placed in solitary confinement). A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong, *see, e.g., United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 589 (2d Cir.1975). A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue, *see, e.g., McCann, supra,* 698 F.2d at 125; *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *Duchesne v. Sugarman,* 566 F.2d 817, 830–31 (2d Cir. 1977). Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event, *see, e.g., Wright v. McCann,* 460 F.2d 126, 135 (2d Cir.1972) (warden responsible for condition of disciplinary units at prison). *Cf. Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (municipality liable for gross negligence in training its prison guards).

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

Plaintiff claims that defendant Martin's involvement in this case falls within these categories in that (1) Martin was reckless and negligent in training and supervising his subordinate Schlessinger, and (2) Martin knew or should have known of actual or potential problems in policies or customs in the United States Attorneys Office and failed to correct them. Defendants, citing *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983), contend that the requisite standard which plaintiff has failed to plead is gross negligence or deliberate indifference. *McCann* held that gross negligence or deliberate indifference is *"an* adequate basis for liability", *id.* at 125 (emphasis added), not that plaintiff's pleadings had to use that precise language. Plaintiff pleads more than ordinary negligence; she pleads both negligence and recklessness. *Cf. Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986). Plaintiff also alleges Martin's failure to correct unconstitutional practices, which does not require gross negligence as a standard. Accordingly, this Court finds that plaintiff has stated a claim under *Bivens* sufficient to withstand a motion to dismiss.

Neither defendants' Local Rule 3(g) Statement nor their other moving papers provide any factual allegations on the part of Martin denying, e.g., a supervisory role, knowledge of Schlessinger's activities, or that Schlessinger's actions were customary. Nor did Martin submit an affidavit in his behalf. Submittal of an affidavit putting forth facts which refute the allegations of the complaint would have provided information essential to this Court's present determinations. Because defendants have failed to provide any facts rebutting plaintiff's claims, summary judgment as to Martin is inappropriate at this time. This Court does not conclude that Martin was personally involved in a deprivation of due process, only that, on this record, Barbera is entitled to attempt to prove that he was. *Williams v. Smith,* 781 F.2d at 324.

*Affirmative Defenses*

### A. *Prosecutorial Immunity*

A prosecutor is absolutely immune from constitutional tort suits for any actions

which are "within the scope of his prosecutorial duties." *Imbler v. Pachtman*, 424 U.S. 409, 420, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976). The *Imbler* Court held that absolute immunity from Section 1983 liability exists for those prosecutorial activities "intimately associated with the judicial phase of the criminal process." *Id.* at 430, 96 S.Ct. at 995. Protected "quasi-judicial" activities include the initiation of a prosecution and the presentation of the government's case, *id.* at 431, 96 S.Ct. at 955, but absolute protection does not extend to a prosecutor's investigative or administrative acts, *id.* at 431 n. 33, 96 S.Ct. at 995 n. 33. As a result, courts are left with the difficult chore of drawing a line separating amorphous and vague notions of "investigative" and "prosecutorial" conduct. *Lee v. Willins*, 617 F.2d 320, 322 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980).

The Second Circuit has endorsed a concept of distinguishing these two types of conduct by reference to the type of harm allegedly suffered. *Id.*

> Under this analysis, a prosecutor is immune from a suit to recover for an injury arising solely from the prosecution itself —e.g., being compelled to stand trial or to suffer imprisonment or pretrial detention. Such harm must always result in substantial part from the protected prosecutorial activities of initiating prosecution or presenting the state's case. Where the alleged harm is inflicted independently of the prosecution, however, absolute immunity will not attach. If, for example, a prosecutor violates the Fourth Amendment by conducting an illegal search, the victim is harmed by invasion of his zone of privacy, whether or not the evidence is introduced at trial. Redress for this harm is not barred by *Imbler*.

*Id.* (citations omitted).

Following this approach, the Second Circuit has held that the doctrine of absolute immunity does attach, for example, for breach of an agreement not to prosecute, *Powers v. Coe*, 728 F.2d 97 (2d Cir.1984), for misconduct before a grand jury, *id.*, for a decision to obtain a material witness order, *Betts v. Richard*, 726 F.2d 79 (2d Cir. 1984), for plea negotiations, *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir.1981), for failure to live up to the plea agreement, *id.*, for falsifying evidence, *Lee v. Willins*, 617 F.2d at 320, and for coercing perjured testimony, *id.* On the other hand, "[t]he 'investigative' and 'administrative' work involved in testifying before a grand jury, accumulating evidence, and disseminating information to the press is analogous to the tasks performed by the police, and therefore only the same qualified 'good faith' immunity is available." *Taylor v. Kavanagh*, 640 F.2d at 453.

In *Maglione v. Briggs*, 748 F.2d 116 (2d Cir.1984) (per curiam), the Second Circuit affirmed the grant of summary judgment to the defendant prosecutor on the grounds of absolute immunity, but noted that

> The complaint also alleged that Briggs was "in charge of the investigations" of the felony charge, suggesting that he was performing investigatory functions apart from the grand jury inquiry. If there were facts to support this conclusory description of Briggs' role, the case might fall within the narrow area that *Imbler* left unresolved, *see* 424 U.S. at 430, 96 S.Ct. at 995; *Taylor*, 640 F.2d at 452. However, Maglione has not specified any facts or circumstances to support this claim. When Judge Miner repeatedly asked counsel to describe Briggs' actions, counsel for Maglione merely replied that Briggs had acted in bad faith. Since it is Briggs' conduct rather than his state of mind that is in issue, summary judgment was properly granted.

*Id.* at 118.

It appears, then, that the Second Circuit does not follow the Ninth Circuit's position, relied on by defendants in their argument, that "[i]nvestigative functions carried out pursuant to the preparation of a prosecutor's case also enjoy absolute immunity." *Freeman v. Hittle*, 708 F.2d 442, 443 (9th Cir.1983) (per curiam).

 It is clear that the alleged conduct attributed to defendant Martin is not protected by the absolute immunity doctrine because training and supervision are administrative functions to which absolute immunity will not attach. Whether Schlessinger is protected by the absolute immunity doctrine is less clear cut. The actions which form the basis of the complaint include Schlessinger's refusal to provide police protection to Barbera and his disclosure to Margolies' attorney that Barbera was cooperating in the Candor investigation. Schlessinger states in his unsworn affirmation that

All of my conversations with Margaret Barbera and various attorneys representing her in 1981 and 1982 were in connection with, and leading up to, her plea agreement and the cooperation in the Candor Diamond investigation that was required as part of that agreement. Similarly, any conversations I had with any attorney representing Irwin Margolies were in connection with the potential prosecution of Margolies.

In effect, Schlessinger affirms that his refusal to provide police protection to Barbera occurred as part of both plea negotiations and the Candor investigation. The Second Circuit has held plea negotiations to be protected by the doctrine of absolute immunity, *Taylor v. Kavanagh*, 640 F.2d at 450, but has suggested that prosecutorial investigations are not, *Lee v. Willins*, 617 F.2d at 322. Schlessinger's conversations with Margolies' attorney clearly occurred as part of Schlessinger's investigation.

Applying the *Lee v. Willins* approach to determine the type of conduct involved here resolves the dilemma and demonstrates that Schlessinger's conduct was of an investigative nature from which he is not absolutely immune. The injury involved, namely Barbera's death, did not arise "solely from the prosecution itself," it allegedly arose from defendants' breach of the government's duty to protect Barbera in light of her special relationship and in violation of the due process clause of the Fifth Amendment. Barbera was harmed allegedly because she was denied her right

to due process. Pursuant to the Second Circuit's holding in *Lee v. Willins*, "[r]edress for this harm is not barred by *Imbler*." *Id.*, 617 F.2d at 322.

Furthermore, this result is not inconsistent with the Second Circuit's holding in *Taylor v. Kavanagh*, 640 F.2d at 450, that plea negotiations are protected by the doctrine of absolute immunity. Applying the rule of *Lee v. Willins* to the Taylor case, the injury suffered as a result of the breach of that plea agreement arose solely from the prosecution, and therefore absolute immunity attached. Because application of the rule of *Lee v. Willins* to the *Barbera* action does not lead to the same conclusion, *Taylor* should not be read to suggest a different result here.

Accordingly, defendants Martin and Schlessinger are not covered by the doctrine of absolute immunity in this case, and the government's motions to dismiss or for summary judgment as to them on this ground are denied.

## B. *Qualified Immunity*

 Good faith or qualified immunity is an affirmative defense in a *Bivens* action. *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983). Plaintiff's claims may be dismissed on grounds of qualified immunity if defendants show that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, the conduct must be reasonable when viewed objectively. *Wyler v. United States*, 725 F.2d at 159.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established

at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the offense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense should turn primarily on objective factors.

*Harlow v. Fitzgerald*, 457 U.S. at 818–19, 102 S.Ct. at 2738 (footnote omitted).

 The *Harlow* Court refashioned the qualified immunity doctrine to permit resolution of many insubstantial claims on summary judgment and to avoid subjecting government officials either to the costs of trial or the burdens of discovery in cases where the legal norms the officials were alleged to have violated were not clearly established at the time. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). Unless plaintiff's allegations state a claim of violation of clearly established law, defendants pleading qualified immunity, as Martin and Schlessinger do here, are entitled to dismissal before the commencement of discovery. *Id.* at 2816. The effect of *Harlow* is to permit summary judgment on the issue of qualified immunity in any case where the material facts are not in dispute. *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir.1985).

 In the case at hand, the determination of whether summary judgment on grounds of qualified immunity is appropriate for either Martin or Schlessinger turns on whether the special relationship doctrine or other government policies were clearly established in late 1981 and early 1982 such

that a reasonable person would have known of the government's concomitant duty to protect Barbera.

The current debate over affirmative duty and constitutional tort stems in large part from a prisoner petition case, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), decided by the Supreme Court in 1976. *Jensen v. Conrad*, 747 F.2d at 190. The first major post-*Estelle* decision, *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), was decided by the Supreme Court in 1980. *Id.* at 192. *Martinez* established the major criteria for determining when the doctrine may apply. In May 1981, the Second Circuit held that the government could violate a constitutionally protected liberty or property interest by failing to protect an individual who had been placed in the government's custody or care. *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir.1981).

Furthermore, the government itself has enacted laws regarding witness protection under certain circumstances—which are inapplicable to the Barbera facts. For example, Congress, aware that threats of retaliation were discouraging government witnesses from testifying against participants in organized crime, passed Title V of the Organized Crime Control Act of 1970. This law authorized the United States Attorney General to provide for the protection and subsistence of persons who might testify for the government at the trials of organized crime figures. It has an exceptional record for safeguarding its participants. *See Doe v. Civiletti*, 635 F.2d 88, 89 (2d Cir.1980). While not directly applicable here, such laws demonstrate the government's general awareness of the special dangers which can be involved in cooperation with government investigations and the government's affirmative provision of protection under appropriate circumstances many years before the Barbera murder.

As a result, it is not likely that the Office of the United States Attorney for the Southern District of New York was unaware of the special relationship doctrine,

and the government's concomitant duty to protect that person's wellbeing, or of the potential danger a person cooperating in a government investigation might face.

In light of Barbera's cooperation with the government, Schlessinger's provision of this information to Margolies' attorney, Chin's disappearance, the government's general awareness of the potential risks attendant to cooperation with the government on criminal investigations, and the state of development of the "special relationship" doctrine at the time of Barbera's death, it cannot be said that either Martin's or Schlessinger's conduct necessarily was objectively reasonable under these circumstances. Nor have either Martin or Schlessinger made any showing of extraordinary circumstances; nor has Martin made a showing that he neither knew nor should have known of the relevant legal standard, as is required by the rule of *Harlow.*

Accordingly, absent any affirmative showing whatsoever by either Martin or Schlessinger that such was not the case in late 1981, qualified immunity is not available to either of them at this stage of the litigation.

## CONCLUSIONS

The claims against William French Smith are dismissed for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. That portion of plaintiff's claim brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, are dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Defendants Martin's and Schlessinger's motions to dismiss or, in the alternative, for summary judgment pursuant to Rules 12(b)(6) and 56 of the Federal Rules as to the *Bivens* claim are denied.

This Court is of the opinion that this Order involves controlling questions of law concerning the "special relationship" doctrine and the doctrines of absolute and qualified immunity and that an immediate appeal from this Order would materially advance the ultimate termination of the litigation. Accordingly, the Court certifies these portions of its Order to the Court of Appeals for the Second Circuit. Pursuant to 28 U.S.C. § 1292(b), application for such appeal must be made within ten days after entry of this Order. Further proceedings in this Court are stayed pending the appeal.

SO ORDERED.