

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-21-2006

# Wrench Transp Ser v. Bradley

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Wrench Transp Ser v. Bradley" (2006). *2006 Decisions.* Paper 52.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/52

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 05-3498

WRENCH TRANSPORTATION
SYSTEMS, INC., and JAMES
MALONE, JR.

                    Appellants

v.

FRANK BRADLEY; JOHN F. KENNEDY;
MARYANNE LEWICKI; LEAH ANN MACMAHON


Appeal from the United States District Court
for the District of New Jersey
( 95-cv-06203)
District Court: Hon. Jose L. Linares

Argued March 28, 2006

Before: McKEE and VAN ANTWERPEN, Circuit Judges,
and POLLAK, District Judge[*]

(Opinion filed: December 21, 2006)

Constantine Bardis, **(Argued)**
1800 Main Street
South Belmar, New Jersey 07719
Counsel for the Appellants

---

[*] Honorable Louis H. Pollak, Senior District Judge for the United States District Court of
the Eastern District of Pennsylvania, sitting by designation.

Brian G. Flanagan, **(Argued)**
Office of the Attorney General, New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, New Jersey 08625
Counsel for the Appellees

Robert P. Shane
Office of the Attorney General, New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, New Jersey 08625
Counsel for the Appellees

OPINION

McKEE, Circuit Judge.

James Malone and Wrench Transportation Systems, Inc., (hereinafter collectively referred to as "Malone") appeal the District Court's grant of summary judgment in favor of New Jersey Deputy Attorneys General John Kennedy and Leah Ann McMahon. For the reasons that follow, we will reverse in part and affirm in part and remand for further proceedings consistent with this opinion.

I. Discussion.

Because we write primarily for the parties, it is not necessary to reiterate the facts or background of this case except insofar as may be helpful to our discussion. Malone argues that the District Court erred in concluding that Kennedy and McMahon were entitled to absolute immunity, and that the Magistrate Judge erred in issuing a protective

order rather than requiring them to answer certain interrogatories during discovery. Malone's argument is partially premised upon the contention that "the initial seizure . . . was based upon a Complaint signed by someone who had no knowledge of its contents [and] the Complaint was based upon an affidavit, affirmed by someone who had no idea [about] what he was affirming. . .. []" Appellants' Br. at 26. Malone argues that the seizure itself was improper because of this alleged infirmity in the Complaint. He clearly makes this argument to strengthen his reliance on *Schrob v. Catterson*, 948 F.2d 1402 (3d Cir. 1991), where the initial seizure was not properly authorized by the court. However, as will become clear from our discussion of *Schrob* below, we believe that absolute immunity extends to Defendants' actions in obtaining the writ of forfeiture and seizing Malone's trucks. Kennedy and McMahon were therefore entitled to judgment as a matter of law insofar as Malone's suit attempts to find them liable for their pre-seizure conduct. *Schrob*, *supra*. Although the District Court correctly concluded that Defendants are entitled to absolute immunity for seizing Malone's property, we do not agree that their post-seizure conduct is similarly protected.

Malone's Complaint is drafted in rather broad language that includes the Defendants' actions before the property was seized as well as their conduct after it was seized. Thus, in order to properly resolve this appeal, we must compartmentalize the conduct that Malone is basing his suit upon. *See Schrob*, 948 F.2d at 1409.

Malone's Complaint alleges:

>Defendants had no intention of pursuing criminal or forfeiture proceedings against Wrench Transportation Systems, Inc. or James Malone. . .. Instead, Defendants intended to use the forefeiture proceedings to coerce Malone into cooperating with the investigation and providing information against [others who] were the target of the investigation.

Complaint at ¶ 35. However, Malone's argument on appeal focuses upon the Defendants' refusal to return the seized property once he demonstrated his innocence, the Defendants' attempt to use the property to coerce James Malone into testifying against others, and conditioning return of the property upon Malone's execution of a release. Malone states: "[t]he constitutional violation . . . that is alleged . . . [is intentionally] refus[ing] to remit the Wrench vehicles notwithstanding their knowledge of Malone's innocense and their improper conditioning of the return of the Wrench vehicles on Malone's provision of false testimony and a release." Appellants' Br. at 21. That assertion is consistent with allegations of post-seizure conduct in the Complaint.[1]

It is clear from the District Court's opinion and the Defendants brief that the dispute over absolute immunity before us turns on the allegations of misconduct regarding the seized property after the seizure, not actions McMahon and Kennedy took to seize the property. Accordingly, we must assume the Defendants deliberately delayed

---

[1] *See* Complaint at ¶ 36 ("After the December 30, 1993 interview, Defendants had no basis to believe and did not believe that criminal proceedings could successfully be undertaken against Wrench Transportation Systems, Inc. or James Malone in connection with the alleged waste oil scheme and had no intention of undertaking such proceedings."); and Complaint at ¶ 38 ("Defendants' intentional use of the continued forfeiture of Wrench's vehicles to coerce Malone into cooperating with their criminal investigation of third parties deprived Wrench . . . and Malone of property without due process of law, in violation of the Fourteenth Amendment . . .".).

4

returning Malone's property after concluding that he was not involved in the illegal conduct they were investigating, that they conditioned returning the property upon Malone executing a release, and that they also attempted to use their continued possession of the property to coerce James Malone into testifying against others.[2] We must decide if any of these actions are covered by the doctrine of absolute immunity as opposed to qualified immunity.[3]

## A. Absolute and Qualified Immunity.

The Supreme Court first addressed prosecutorial immunity from suit under § 1983 in *Imbler v. Pachtman*, 424 U.S. 409 (1976). The plaintiff there was a convicted murderer who sued the prosecutor and others under § 1983 arguing that the prosecutor had used fabricated testimony and withheld exculpatory evidence to obtain the conviction. The Court held "that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id*. at 431.

We discussed *Imbler* in *Schrob*. Schrob owned an interest in a business and brought a civil rights action against drug enforcement officials and a federal prosecutor (Catterson) to recover for constitutional violations that allegedly arose from the civil

---

[2] In reviewing the District Court's grant of summary judgment to Defendants, we must assume that all of Malone's allegations are true and afford Malone the benefit of all reasonable inferences based upon those allegations. We then determine if Defendants are entitled to judgment as a matter of law. *See Serbin v. Bora Corp., Ltd.,* 96 F.3d 66, 68 n.1 (3d Cir. 1996).

[3] To the extent that Malone is arguing that Kennedy and McMahon are not entitled to either absolute or qualified immunity, Appellants' argument is meritless, and can be rejected without discussion. *See Schrob*, *infra.*

5

forfeiture of Schrob's property.[4]  Catterson had knowingly made false statements when he appeared before a Magistrate Judge to request a warrant to seize property that Schrob had an interest in.[5]  After obtaining a forfeiture warrant and seizing the property, Schrob met with Catterson and "demonstrated the legitimacy of his investment in [the seized property]." 948 F.2d at 1406.  Thereafter, Schrob sued Catterson alleging "that the return of [his property] was unduly delayed because Catterson demanded . . . a release from personal liability for his actions related to the seizure." *Id*. at 1406.  The District Court denied Catterson's motion to dismiss on grounds of absolute immunity and Catterson appealed.

On appeal, we began by compartmentalizing our inquiry and focusing on each of the allegations of misconduct. We looked at the drafting and filing of the *in rem* complaint, actions taken to prepare and apply for the seizure warrant, participation in the *ex parte* hearing to obtain the warrant, and "actions surrounding the seizure, retention and release of the [seized] property." *Id*. at 1409.

We held that absolute immunity extended to Catterson's actions in creating and

---

[4] In *Schrob*, the plaintiff sued under *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Here, Malone sued under 42 U.S.C. § 1983. However, there is no distinction for purposes of our analysis. *See Schrob*, 948 F.2d. at 1409 ("courts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer limits of a *Bivens* claim against federal officials. It would be untenable to draw a distinction for purposes of immunity law . . .").

[5] *In rem* forfeiture is based on the fiction that the property itself is guilty of a crime. *Schrob*, 948 F.2d at 1411. In *Schrob*, we refused to distinguish between the prosecutor's more traditional role and his analogous role in the civil *in rem* proceeding at issue.

filing the *in rem* complaint because that was part of his "prosecutorial function." *Id*. at 1409. We concluded that Catterson's actions "in appearing before a judge and presenting evidence in support of a search warrant application clearly involve the prosecutor's role as advocate for the State, rather than his role as administrator or investigative officer." *Id*. at 1419 (citations and internal quotation marks omitted). Our analysis was guided by the importance of ensuring that a prosecutor's discretion remain unfettered by concerns of personal liability so that he/she would exercise his/her best judgment in "deciding which suit to bring and in conducting them in court." *Id*. at 1410 (quoting *Imbler*, 424 U.S. at 424-25).

However, we held that Catterson's management of the seized property was only covered by qualified immunity because those actions were "not directly related to the judicial process. Instead, he was acting in an administrative role." *Id*. at 1419. We reasoned that "[q]ualified immunity will provide sufficient protection to the prosecutor's management of the property." *Id*.

Our analysis in *Schrob* focused on the fact that *Imbler* "recognized that the prosecutor's role as an advocate may take the prosecutor beyond the confines of the courtroom." 948 F.2d at 1414. Accordingly, the line between absolute and qualified immunity could not depend on the forum in which the challenged conduct occurred. Rather, we distinguished between "purely investigative matters," and those that more closely resembled the traditional prosecutorial role. *Id*. We concluded that Catterson's

7

actions in seeking the warrant were tantamount to preparing to present a case as a prosecutor and that Catterson was entitled to absolute immunity for actions taken in that capacity. They were "encompassed within the prosecutor's advocacy function." *Id*. at 1416.

Given that analytical framework, we readily disposed of allegations of liability based upon Catterson's participation in the seizure hearing. Even though Schrob had alleged that Catterson only obtained the warrant by resorting to "a bald faced lie," we held that Catterson was absolutely immune from suit based upon his conduct in court even if he had intentionally misled the court in seizing Schrob's property.

We then addressed Schrob's final set of allegations. They included claims that Catterson was liable for the delay in returning the seized property, and demanding a release. *Id*. at 1417. We rejected Catterson's claim of absolute immunity for these actions because they did not bear a sufficient nexus to the underlying goal of freeing the "'*judicial process'* from the harassment and intimidation associated with litigation, . . .". *Id*. at 1418 (emphasis added). The delay in returning the property, and demands for a release/indemnification were "not directly related to the judicial process." *Id*. at 1419. Although "the decision to release the property . . . involve[d] prosecutorial discretion[,]" that discretion was not sufficiently related to the judicial process to warrant the protection of absolute, as opposed to qualified, immunity. "[W]hen a prosecutor acts outside of the judicial process he acts outside the protection of absolute immunity . . .". *Id*. at 1420

(internal quotation marks omitted).

Although *Schrob* at first appears to be "on all fours" with the Defendants' post-seizure conduct here, there are some important distinctions. In *Schrob*, the initial seizure was invalid, and that influenced our analysis. We noted, "the seizure of Schrob's property . . . was not authorized from the outset, . . . Accordingly, the . . . property should have been immediately released." *Id*. at 1420. Nevertheless, *Schrob* is quite helpful to the present inquiry. Moreover, we recently amplified our analysis in *Schrob* in *Yarris v. County of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006).

The plaintiff in *Yarris* had been convicted of rape/murder and sentenced to death, but was eventually exonerated by DNA testing. He thereafter sued the prosecutor alleging that his conviction resulted from the prosecutor withholding evidence and manufacturing testimony that had been introduced at trial. The prosecutor argued that he was absolutely immune from liability and moved to dismiss. Although we agreed that conduct related to the actual prosecution of Yarris was protected by absolute immunity, we held that the prosecutor was only entitled to qualified immunity for conduct that was primarily investigative or administrative in nature. "'A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings[]'" are entitled only to qualified immunity. *Yarris,* 465 F.3d at 135 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 273 (1993)). We again explained that absolute immunity "extends to acts that are 'intimately

9

associated with the judicial phase of the criminal process, such as initiating a prosecution and . . . presenting the State's case.'" *Id.* (quoting *Imbler*, 424 U.S. at 430-1).

Thus, our inquiry here must focus on "the nature of the function performed, . . .". *Kalina v. Fletcher,* 522 U.S. 118 (1997).  Our discussion in *Yarris* exemplifies this focus. There, we relied upon the distinction between nondisclosure of evidence on the one hand, and destruction of evidence on the other. That distinction was not based upon the more egregious nature of the latter.  Rather, it was rooted in the relationship of each act to the judicial process  as well as the nature of the prosecutorial function. Nondisclosure was covered by absolute immunity and destruction of evidence by qualified immunity because "[u]nlike decisions on whether to withhold evidence from the defense, decisions to destroy evidence are not related to a prosecutor's prosecutorial function." *Yarris*, 465 F.3d at 136.

> [O]nce the decision is made not to furnish evidence to the
> defense, no additional protectible prosecutorial discretion is
> involved in deciding to dispose of it, and . . ., while deciding
> not to furnish the prosecution's evidence to the defense may
> be an act of advocacy, throwing the evidence away is not such
> an act.

*Id.* at 136-7 (quoting *Wilkinson v. Ellis,* 484 F. Supp. 1072, 1083 (E.D. Pa., 1980)).

We also held that absolute immunity did not extend to the prosecutor's response to Yarris's request for DNA testing.  The prosecutor did not establish that "his response to Yarris's DNA test requests was part of [his] advocacy for the state in post-conviction proceedings in which [he was] personally involved." *Id*. at 138.  Absent that relation to

10

post-conviction proceedings, those actions lacked a sufficient nexus to the judicial process to entitle the prosecutor to absolute immunity. Instead, the actions were properly classified as administrative or investigative; they were not prosecutorial.

Accordingly, "[a]bsolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings . . . where the prosecutor is personally involved . . . and continues his role as an advocate," but "where the role as advocate has not yet begun . . . or where it has concluded, absolute immunity does not apply." *Id.* at 137 (citations and internal quotation marks omitted).

In *Yarris*, we did not resolve the prosecutor's liability for allegedly manufacturing a false confession because, absent additional fact finding, we could not determine whether he was acting as the state's advocate in preparing for trial when the confession was allegedly obtained. *Id*. at 139 (the "key question is whether the ADAs were functioning as the state's advocates when they engaged in the conduct that gave rise to the evidence-fabrication allegations.").

Given this analytical framework, it becomes clear that a prosecutor's role of appearing before a judge and presenting evidence in support of a warrant implicates the prosecuting attorney's role as an advocate for the state rather than "his role as 'an administrator or investigative officer.'" *Burns v. Reed*, 500 U.S. 478, 491 (1991).

We realize, of course, that almost any action a prosecutor takes within the scope of his/her employment is arguably undertaken pursuant to his/her role as an advocate for the

11

state. "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but [the Supreme Court has] never indicated that absolute immunity is that expansive. Rather, as in *Imbler,* we inquire into whether the prosecutor's actions are closely associated with the judicial process." *Burns,* 500 U.S. at 495 (internal quotation marks omitted).

As the Court explained in *Buckley*, **"**[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." 509 U.S. at 273. There, the Court was speaking of the distinction between investigation and prosecution, but the line the Court drew is quite helpful here.

Malone's suit rests upon allegations of conduct regarding a release that are most accurately classified as purely investigative in nature. That conduct was not tied to prosecuting a case against James Malone or Wrench, nor can it be maintained that the defendants had probable cause to prosecute them given the allegations in the complaint. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley,* 509 U.S. at 274. In attempting to use Malone's property to force James Malone to testify against others, Kennedy and McMahon were functioning as investigators outside of the judicial process, not as

12

prosecutors inside of it. *Id.* Accordingly, they are entitled to no greater protection than we would afford police officers engaged in similar conduct. The Defendants' "immediate purpose was to conduct a more thorough investigation of the crime--not to return an indictment against a suspect whom there was already probable cause to arrest." *Id.* at 275.

By analogy, we note that the prosecutor's role as legal counsel to the police is entitled only to qualified immunity even though it, like the role of advocate, could expose the prosecutor to burdensome litigation as a result of his/her official actions while representing the government. The doctrine of qualified immunity is not intended to shield one functioning as a prosecutor from all exposure to liability arising from "official" actions. As we have explained, although its application is to the person of the defendant, the doctrine's underlying concern is with the judicial process itself. *Forrester v. White*, 484 U.S. 219, 224 (1991) (per curiam). That is why any discussion of the applicability of absolute immunity must focus on the "nature" and "function" of the act, not the "act itself." *Schrob*, 948 F.2d at 1408.

This focus was evident in *Schrob* where we observed that, given the improprieties in the original seizure, the judicial process "[did] not serve as an adequate check on a prosecutor's actions . . .." 948 F.2d at 1420. The discussion in *Imbler*, recognized that:

> [v]arious post-trial procedures are available to determine whether an accused has received a fair trial. These . . . include the remedial powers of the trial judge, appellate review, and the state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair

13

trial under law.

424 U.S. at 427. The availability of possible remedies was important because it addressed the concern that the prosecutor's "focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." *Imbler*, 424 U.S. at 427.

Malone alleges that he and his attorney met with Kennedy and McMahon around December 30, 1993, to discuss Malone's involvement in the scheme to sell waste oil as virgin fuel oil. Kennedy sent a letter establishing the date and time of the meeting as well as the terms on which it would take place. The letter stated: "if I am not satisfied from Mr. Malone's statement that he and Wrench are innocent of any criminal involvement, then I will not recommend dismissal of the forfeiture complaint." App. at 904.

There is a distinct difference between conversations that occur in preparation for a judicial proceeding and negotiations that occur concerning the return of seized vehicles once prosecutors conclude that they have seized property from someone who was not involved in criminal conduct. In May of 1995, McMahon offered to return Malone's remaining tanker if Malone would release the state of New Jersey and its employees from all claims of liability. App. at 536. That negotiation was not part of the judicial process. Rather, it was administrative in nature. In delaying return of the truck until Malone executed a release, Kennedy and McMahon were clearly acting outside the parameters of

14

the judicial process, and outside of their role as prosecutors. *See Imbler,* 424 U.S. at 419 (quoting *Scheur v. Rhodes,* 416 U.S. 232, 238-39 (1974)).

They were acting more in the capacity of investigators or in the administrative capacity of custodian of property in retaining Malone's trucks and using them to get James Malone to testify against others. We recognize that those actions were taken in connection with their role as prosecutors. Nevertheless, those actions do not bear a sufficient nexus to the underlying goal of freeing the "'judicial process' from the harassment and intimidation associated with litigation, . . ." *Schrob*, 948 F.3d at 1418, that lies at the heart of the protections afforded under the doctrine of absolute immunity. The discretion involved is not so related to the judicial process that it is entitled to the protection afforded by that doctrine. *See Id*. at 1420.

Thus, the District Court erred in granting summary judgment in favor of McMahon and Kennedy based upon the conclusion that they were absolutely immune from the allegations that they delayed return of Malone's property and conditioned it upon execution of a release. We do, however, agree that McMahon and Kennedy are entitled to summary judgment insofar as Malone attempts to rest liability on their alleged attempts to force James Malone to provide false testimony.

### B. Allegations of Coerced False Testimony.

There is no evidence on this record that Kennedy or McMahon requested false testimony from James Malone in exchange for the release of his vehicles. John Frieri,

15

Malone's former counsel, stated in his affidavit that Investigator Bradley said, "Malone would have to provide testimony against someone higher up in the investigation in exchange for a dismissal." However, Malone does not allege that either Kennedy or McMahon were party to that conversation, or even aware of the request. Although the District Court's grant of summary judgment to them was based upon the court's belief that they were entitled to absolute immunity, summary judgment was nevertheless appropriate because the record does not allow a reasonable fact finder to find Kennedy or McMahon liable based upon the investigator's attempt to coerce testimony from Malone. *See Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n. 8 (3d Cir. 2000) ("An appellate court may affirm a decision on a ground other than that relied on by the district court.").

### C. The Interrogatories.

During discovery, Defendants objected to some of Malone's interrogatories and sought a protective order arguing that some of the information sought was privileged. Magistrate Judge Hedges agreed and issued a protective order. Malone appealed that order to the District Court, and that court reversed because Magistrate Judge Hedges had not balanced Malone's need for the information against the Defendants' need for secrecy. Thereafter, Magistrate Judge Linares conducted the balancing as ordered by the District Court. He concluded that the Defendants' need for secrecy outweighed Malone's need for the information and he therefore entered a protective order as requested by the

Defendants. Malone never appealed that order. Rather, Malone now attempts to challenge that order as part of the appeal of the District Court's grant of summary judgment in favor of Kennedy and McMahon based upon the District Court's conclusion that they are entitled to absolute immunity.

The discovery dispute was originally referred to the Magistrate Judge pursuant to the Federal Magistrate Judges Act, 28 U.S.C. § 636 (b)(a)(A). That section allows Magistrate Judges to hear and determine nondispositive pretrial matters. The Magistrate Judge's rulings on those matters are determinative unless overruled by the District Court. *See United Steelworkers v. New Jersey Zinc Co., Inc.,* 828 F.2d 1001, 1005 (3d Cir. 1987). In *United Steelworkers*, we approvingly quoted the following statement from *Niehaus v. Kansas Bar Association*, 793 F.2d 1159, 1164-65 (10th Cir. 1986). "'[B]y failing to file timely objections to the magistrate's discovery order, appellants not only stripped the district court of its function of effectively reviewing the magistrate's order, but also frustrated the policy behind the Magistrate's Act. . ..'" *United Steelworkers,* 828 F.2d at 1007.

In *Continental Casualty Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 252 (3d Cir. 1998), we stated, "[t]his Court has specifically held that a party failing to appeal to the district court a magistrate judge's order in a nondispositive matter may not raise an objection to it on appeal to a circuit court[]" absent "exceptional circumstances." We also explained that the "exceptional circumstances" that would justify a departure from that

17

general rule must be narrowly interpreted. Thus, we would only address such issues "when the public interest requires [it], . . . when manifest injustice would result . . .. or when the alleged error [is] fundamental and result[s] in a highly prejudicial error . . .." *Id*.

Malone claims that he will be severely prejudiced if we do not review the protective order here because he can not establish liability without answers to those interrogatories. Whether or not that is true, it is not sufficient to establish the "manifest injustice" required to review an issue in the absence of a properly filed objection to a Magistrate Judge's ruling. "Mere prejudice is insufficient to retrieve an abandoned issue." *Id*.

### III. Conclusion.

Accordingly, we will reverse the decision of the District Court granting absolute immunity to Kennedy and McMahon, based upon their conduct in delaying the return of Malone's trucks and conditioning that return on the execution of a release. We will affirm the District Court's grant of summary judgment based upon allegations that Kennedy and McMahon attempted to use the forfeiture to force James Malone to testify against other individuals. We do not reach Malone's claim that the Magistrate Judge erred in entering a protective order allowing Defendants to refuse to answer certain interrogatories.

18